## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| J.L., an individual;<br><br>                Plaintiff<br><br>      -against-<br><br>BEST WESTERN INTERNATIONAL, INC.;<br>HYATT CORPORATION; WYNDHAM HOTELS<br>AND RESORTS, INC.; AND MARRIOTT<br>INTERNATIONAL, INC.;<br><br>              Defendants. | CIVIL ACTION NO :<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW the Plaintiff J.L., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2. Best Western International, Inc., Hyatt Corporation, Wyndham Hotels and Resorts, Inc., and Marriott International, Inc. (collectively "the Defendants") know and have known for more than a decade that sex trafficking repeatedly occurs under their flags throughout the country. Rather than taking timely and effective measures to thwart this epidemic, the Defendants have instead chosen to ignore the open and obvious presence of sex trafficking across their brands while enjoying the profits from rooms rented for this explicit and apparent purpose.

3. This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials J.L., under the federal William Wilberforce Trafficking Victims Protection

1

Reauthorization Act of 2008 (hereinafter "TVPRA").

4.    J.L. was first trafficked for commercial sex at the age of seventeen (17) years old in Denver, Colorado.  The child of a volatile home, J.L. feared she had become too much of a burden on her father and ran away from his custody with the simple belief that she was effecting the inevitable. Homeless in Denver, J.L. was introduced by her friend to a man who promised that he could help J.L. make money to support herself. The man brought J.L. to his room at the Best Western® Plus at the Denver Tech Center, located at 9231 E Arapahoe Rd.  Inside, he bludgeoned J.L. with a gun rendering her completely unconscious, then stripped her nude, tied her to the bed, raped her, and posted naked photos of her online at Backpage.com advertising her for commercial sex. In the days to follow, under the seemingly constant watch of an armed guard J.L. was shuttled throughout the Denver Tech Center and forced by her trafficker to sexually service numerous buyers at the various hotels within its limits. J.L. was imprisoned by her traffickers for over a month before the Federal Bureau of Investigation recovered her.

5.    The Plaintiff now brings this action for damages against the Defendants listed herein.  Each of the Defendants, in violation of  18 U.S.C. § 1595, knowingly benefited from a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6.    J.L. was advertised on Backpage.com against her will, physically tortured, and then sexually exploited under such duress at hotels throughout the Denver Tech Center, including the Best Western® Plus, Hyatt Place®, La Quinta® Inn & Suites, and Sheraton®.

7.    As a direct and proximate result of the Defendants' consistent refusals to prevent human trafficking at their hotel properties, J.L. was sexually exploited and repeatedly victimized at hotels under the Defendants' flags.

## **PARTIES**

8.    The Plaintiff, having moved to proceed anonymously,[1] and, herein, identified by her initials J.L.,

---

[1] Contemporaneously with the Complaint, Plaintiff J.L. filed a Motion for Protective Order and Leave to Proceed Anonymously with Memorandum in Support based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. That motion is pending. Undersigned Counsel will provide her identity to counsel for the Defendants upon proper effectuation of service.

was only seventeen (17) years old when she was sold for sex and trafficked throughout the Denver Tech Center.  The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).  The Plaintiff currently resides in Douglas County, Colorado.

9.      Defendant Best Western International, Inc. (hereinafter "Best Western") is one of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees.  It is an Arizona corporation headquartered in Phoenix, Arizona. Best Western International, Inc. may be served with service of process by serving its registered agent The Prentice Hall Corporation System, Inc. at 1900 W. Littleton Boulevard, Littleton, Colorado 80120.

    a.   Best Western® is a Best Western brand property.

    b.   As a hotel operator, Defendant Best Western controls the training and policies for its branded properties including the Best Western® hotel where J.L. was trafficked. Defendant Best Western represents that it considers guest safety and security important and requires the hotels in its portfolio to comply with Best Western brand standards and all local, state, and federal laws.[2]

    c.   By and through its relationship with the staff at the Best Western® where J.L. was trafficked, and the perpetrator who trafficked J.L. at the Best Western® while registered as a guest there, Defendant Best Western knowingly benefited, or received anything of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

    d.   Best Western receives a percentage of the gross room revenue from the money generated by the operations of all Best Western® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

---

[2] Best Western International Human Rights Policy, https://www.bestwestern.com/en_US/about/press-media/best-western-human-rights-policy.html (last visited Nov. 20, 2019).

    e.   Best Western owns, supervises, and/or operates the Best Western® Plus – Denver Tech Center, located at 9231 E Arapahoe Road, Greenwood Village, Colorado 80112.

    f.   Best Western is subject to the jurisdiction of this Court because it regularly transacts business in Colorado, operates dozens of hotels in Colorado, including the Best Western® Plus – Denver Tech Center, contracts to supply services in Colorado, caused indivisible injuries to the Plaintiff in Colorado, and profited from an illegal sex trafficking venture at the Best Western® Plus – Denver Tech Center.

10.   Defendant Hyatt Corporation (hereinafter "Hyatt") is another of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation headquartered in Chicago, Illinois and can be served by its registered agent United States Corporation Company, 1900 W. Littleton Boulevard, Littleton, Colorado 80120.

    a.   Hyatt Place® is a Hyatt brand property.

    b.   As a hotel operator, Defendant Hyatt controls the training and policies for its branded properties including the Hyatt Place® hotel where J.L. was trafficked. Defendant Hyatt represents that it considers guest safety and security important and requires the hotels in its portfolio to comply with Hyatt brand standards and all local, state, and federal laws.[3]

    c.   By and through its relationship with the staff at the Hyatt Place® where J.L. was trafficked and the perpetrator who trafficked J.L. at the Hyatt Place® while registered as a guest there, Defendant Hyatt knowingly benefited, or received anything of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

    d.   Hyatt receives a percentage of the gross room revenue from the money generated by the operations of Hyatt Place® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

---

[3] About Hyatt: Corporate Responsibility – Human Rights, https://about.hyatt.com/en/hyatt-thrive/human-rights.html (last visited Nov. 20, 2019).

    e.   Hyatt owns, supervises, and/or operates the Hyatt Place® Denver Tech Center located at 8300 E Crescent Parkway, Englewood, Colorado 80111.

    f.   Hyatt is subject to the jurisdiction of this Court because it regularly transacts business in Colorado, operates dozens of hotels in Colorado, including the Hyatt Place® Denver Tech Center, contracts to supply services in Colorado, caused indivisible injuries to the Plaintiff in Colorado, and profited from an illegal sex trafficking venture at the Hyatt Place® Denver Tech Center.

11.    Defendant Wyndham Hotels and Resorts, Inc. (hereinafter "Wyndham") is another of the world's largest hotel companies and offers public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Parsippany, New Jersey and can be served by its registered agent Corporate Creations Network Inc., 3411 Silverside Road, Suite 104, Wilmington, Delaware.

    a.   Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of the predecessor.

    b.   As of 2018, La Quinta Holdings, Inc. is a wholly owned subsidiary of Defendant Wyndham Hotels and Resorts, Inc. Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to La Quinta Holdings, Inc. and retains successor liability for the wrongful acts of the predecessor.

    c.   La Quinta® is a Wyndham brand property.

    d.   As a hotel operator, Defendant Wyndham controls the training and policies for its branded properties including the La Quinta® hotel where J.L. was trafficked.

    e.   Defendant Wyndham maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Wyndham brand

standards and all local, state, and federal laws.[4]

f.  By and through its relationship with the staff at the La Quinta® hotel where J.L. was trafficked and the perpetrator who trafficked her at the La Quinta® while registered as a guest there, Defendant Wyndham knowingly benefited, or received anything of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

g.  Wyndham receives a percentage of the gross room revenue from the money generated by the operations of La Quinta® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

h.  Wyndham owns, supervises, and/or operates the La Quinta® Inn & Suites – Denver Tech Center located at 7077 S Clinton Street, Greenwood Village, Colorado 80112.

i.  Wyndham is subject to the jurisdiction of this Court because it regularly transacts business in Colorado, operates dozens of hotels in Colorado, including the La Quinta® Inn & Suites – Denver Tech Center, contracts to supply services in Colorado, caused indivisible injuries to the Plaintiff in Colorado, and profited from an illegal sex trafficking venture at the La Quinta® Inn & Suites – Denver Tech Center.

12.  Defendant Marriott International, Inc. (hereinafter "Marriott") is another of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation headquartered in Bethesda, Maryland and can be served by its registered agent The Corporation Company, 7700 E Arapahoe Road, Suite 220, Centennial, Colorado 80112.

a.  Defendant Marriott International, Inc. is the successor entity to Starwood Hotels and Resorts Worldwide, Inc. and retains successor liability for the wrongful acts of the

---

[4] Wyndham Hotels and Resorts, 2019 Social Responsibility Report: Protecting Our Human Rights (p.30) available at https://corporate.wyndhamhotels.com/wp-content/uploads/2019/07/Wyndham-GRI-2019-Final_web.pdf (last visited Nov. 20, 2019).

predecessor.

b.   As of 2016, Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts Worldwide, Inc. is a wholly owned subsidiary of Marriott International, Inc.

c.   Sheraton® is a Marriott brand property.

d.   As a hotel operator, Defendant Marriott controls the training and policies for its branded properties including the Sheraton® hotel where J.L. was trafficked.  Defendant Marriott represents that it considers guest safety and security important and requires the hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[5]

e.   By and through its relationship with the staff at the Sheraton® where J.L. was trafficked and the perpetrator who trafficked J.L. at the Sheraton® while registered as a guest there, Defendant Marriott knowingly benefited, or received anything of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

f.   Marriott receives a percentage of the gross room revenue from the money generated by the operations of Sheraton® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

g.   Marriott owns, supervises, and/or operates the Sheraton® Denver Tech Center located at 7007 S Clinton Street, Greenwood Village, Colorado 80112.

h.   Marriott is subject to the jurisdiction of this Court because it regularly transacts business in Colorado, operates dozens of hotels in Colorado, including the Sheraton® Denver Tech Center, contracts to supply services in Colorado, caused indivisible injuries to the Plaintiff in Colorado, and profited from an illegal sex trafficking venture at the Sheraton® Denver Tech Center.

---

[5] Marriott International Inc., Human Rights Policy Statement (July 2017) available at
https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

13.    Whenever reference is made in this Complaint to any act, deed or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

### JURISDICTION AND VENUE

14.    This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.)

15.    Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

### SEX TRAFFICKING UNDER FEDERAL LAW

16.    Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

17.    To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse.  Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590.  The crime of slavery can then be divided into the two (2) elements remaining: the act and the means.  The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

18.    Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22

U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

19.   Pursuant to 18 U.S.C. §1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion – or performed by a minor under the age of 18 – are guilty of sex trafficking.  This includes, at a minimum, ***both*** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work ***and*** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[6]

## FACTUAL ALLEGATIONS

### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project [7]*

20.   Human trafficking is the world's fastest growing crime.[8]  While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[9]

21.   Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

22.   The hospitality industry plays a crucial role in the sex trade.[10]  The trope of the "no-tell motel"

---

[6] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law ***both*** categories are 'traffickers'.
[7] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[8] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[9] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[10] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

23.   According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[11]  Traffickers and buyers alike frequently use hotel rooms to exploit victims.

24.   Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an 'in call'.

25.   Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[12]

26.   The problem is industry wide.  In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[13]  Even estimates by attorneys *for* the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[14]

27.   Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[15]  Traffickers and buyers capitalize on the hotel industry's general

---

[11] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.
[12] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[13] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[14] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[15] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

28.   Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.  Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

29.   But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply.  As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[16]

30.   Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry.  The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[17]

31.   From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

32.   Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days,

---

[16] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[17] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[18]

33.    Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[19] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

34.    Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[20]

35.    In 2008, 18 U.S.C. § 1595 effectively required all companies with a peculiar proximity to human trafficking to use reasonable measures and conduct proactive audits to ensure that they were not profiting from what they *should know* are human trafficking ventures.

36.    The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

37.    In 2011, Wyndham trained only some of its employees to look for signs of trafficking.[21]

38.    In 2012, an anti-trafficking coalition alerted Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[22]

---

[18] Id. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[19] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[20] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[21] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.

[22] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).

39.     Marriott International claims it amended its Human Rights Policy as early as 2006 to reflect growing concerns regarding human trafficking and reviews the policy annually. To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention." [23]

40.     Choice Hotels has supported the anti-trafficking group Polaris since 2010 and in a partnership with EPCAT ((End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes)) developed a training module in 2010 for hotel management and staff.[24]

41.     A number of nationwide campaigns recognized the acute issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign, and then domestically in 2010 with the Department of Homeland Security's Blue Campaign.[25]   These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[26]

42.     Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies.  Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

### B.     THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

43.     Hotel brands or flags lend their name and likeness to third party owners, while the building and

---

[23] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at
https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at
https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).
[24] Human Rights Policy, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019).
[25] DHS Blue Campaign Five Year Milestone, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015),
https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[26] Human Trafficking and the Hospitality Industry, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

operations are run by a franchisee or third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

44.     The average consumer does not see this relationship.  The parent brand gives the property its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand.  The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

45.     In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.  Thus, booking and room reservations are controlled by the corporate parent brand.[27]

46.     The local hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

47.     Per the contract or franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the agreement if the local hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

48.   At the time of the incidents alleged herein:

   a.   Defendant Best Western owned and controlled the Best Western® brand.

   b.   Defendant Hyatt owned and controlled the Hyatt Place® brand.

   c.   Defendant Wyndham owned and controlled the La Quinta® brand.[28]

---

[27] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.
[28] La Quinta Holdings, Inc. is now a wholly owned subsidiary of Defendant Wyndham Hotels and Resorts, Inc.

    d.   Defendant Marriott International, Inc. owned and controlled the Sheraton® brand.

49.    Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments so it is seldom done.

## C.  THE DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR BRANDED HOTELS

50.   Defendants Best Western, Hyatt, Wyndham, and Marriott have been on notice of repeated incidences of sex trafficking occurring across their Best Western®, Hyatt Place®, La Quinta® and Sheraton® hotels yet these brand managers failed to take the necessary action to prevent sex trafficking within their brand and continue to fail.

51.   BEST WESTERN INTERNATIONAL:

    a.   Defendant Best Western controls, owns, supervises, or operates the Best Western® Plus – Denver Tech Center located at 9231 E Arapahoe Road, Greenwood Village, Colorado 80112.  Best Western failed to implement and enforce any of their own policies and protect Plaintiff J.L. from being trafficked.

    b.   Founded in 1946, Best Western represents that they have more than seventy-three (73) years of experience in managing successful brands. From all of their Best Western® properties, Defendant Best Western receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

    c.   Defendant Best Western knew or should have known that the Best Western® Plus where Plaintiff J.L. was trafficked for commercial sex was an area known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff J.L. was trafficked.[29]

    d.    Despite having knowledge of the extensive prostitution and sex trafficking that occurs

---

[29] *See* Anusha Roy, *Stock show has investigators on high alert for human trafficking*, 9News (Jan.5, 2017) https://www.9news.com/article/news/crime/stock-show-has-investigators-on-high-alert-for-human-trafficking/73-382739785. *See also* Jesse Paul, *FBI recovers 6 minors, arrests 2 in Denver Stock Show sex trade sting*, The Denver Post (Jan. 26, 2015) https://www.denverpost.com/2015/01/26/fbi-recovers-6-minors-arrests-2-in-denver-stock-show-sex-trade-sting/

at hotels and specifically their hotels, Defendant Best Western has repeatedly failed to thwart these activities.

e.   Defendant Best Western can exercise control over Best Western® hotels by:

   i.   distributing information to assist employees in identifying human trafficking;

   ii.   providing a process for escalating human trafficking concerns within the organization;

   iii.   requiring all employees to attend training related to human trafficking;

   iv.   providing new hire orientation on human rights and corporate responsibility;

   v.   providing training and education to Best Western® branded hotels through webinars, seminars, conferences, and online portals;

   vi.   developing and holding ongoing training sessions on human trafficking;

   vii.   conducting audits of training protocols; or

   viii.   providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

f.   Defendant Best Western is in an agency relationship with its Best Western® hotels offering public lodging services. This agency relationship was created and is maintained through Defendant Best Western's exercise of an ongoing and systemic right of control over Best Western® hotels by Defendant Best Western's operations, including the means and methods of how Best Western® hotels conduct daily business including:

   i.   hosting online bookings on Defendant Best Western's domain;

   ii.   requiring Best Western® hotels to use Defendant Best Western's customer rewards program;

   iii.   setting parameters on employee wages;

   iv.   making employment decisions;

   v.   advertising for employment;

  vi. sharing profits;

  vii. standardized training methods for employees;

  viii. building and maintaining the facility in a manner specified by Best Western;

  ix. standardized or strict rules of operation;

  x. regular inspection of the facility and operation by Best Western;

  xi. fixing prices; or

  xii. other actions that deprive Best Western® hotels of any independence in business operations.

g. Apparent agency also exists between Defendant Best Western and Best Western® hotels. Defendant Best Western holds out Best Western® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

h. Given Defendant Best Western's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Best Western breached its duties in the following ways:

  i. did not adequately distribute information to employees on identifying human trafficking;

  ii. failed to provide a process for escalating human trafficking concerns within the organization;

  iii. failed to mandate all managers, employees, or owners attend training on identifying human trafficking;

  iv. failed to provide new hire orientation on human rights and corporate responsibility;

  v. failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

  vi. failed to develop, hold, and require ongoing training sessions on human trafficking; or

17

> > vii. failed to provide checklists, escalation protocols and information to property management staff, or tracking performance indicators and key metrics on human trafficking prevention.

> i. For years, Defendant Best Western has demonstrated willful blindness to the rampant sex trafficking occurring throughout its Best Western® brand across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff J.L. at a Best Western® that forms the basis for this complaint.

> > i. In February 2009, six (6) arrests were made for sex trafficking at a Best Western® in Clackamas, Oregon.[30]

> > ii. In May 2011, a man was arrested and criminally charged for sex trafficking a fifteen (15) year old girl at a Best Western® in Quincy, Massachusetts.[31]

> > iii. In December 2013, a man was arrested for trafficking women out of a Best Western® in Rockville, Maryland.[32]

> > iv. In 2014, the city of Columbus, Ohio brought a nuisance claim for allowing drug deals and sex trafficking at a Best Western® in Columbus, Ohio[33]

> > v. In February 2015, a man was arrested for running a sex trafficking operation out of a Best Western® in Roseville, California.[34]

> > vi. In July 2015, a man was arrested for trafficking women out of a Best Western® in King of Prussia, Pennsylvania.[35]

> > vii. In December 2015, a man was arrested for trafficking a 15 year-old out of a Best Western® in South Plainfield, New Jersey.[36]

---

[30] https://www.oregonlive.com/clackamascounty/2009/02/girl_17_found_in_clackamas_pro.html
[31] http://archive.boston.com/news/local/massachusetts/articles/2011/05/21/man_charged_with_abducting_teen_and_forcing_her_into_prostitution/.
[32] https://www.nbcwashington.com/news/local/Inmate-May-Have-Run-Prostitution-Ring-From-Jail-236453261.html
[33] https://www.youtube.com/watch?v=tQ0avWxGHsI
[34] http://www.thepresstribune.com/article/2/06/15/roseville-police-.
[35] https://patch.com/pennsylvania/norristown/norristown-area-prostitution-sentencings-are-tuesday-0
[36] https://www.nj.com/union/2015/12/plainfield_man_who_recruited_girl_for_prostitution.html

viii.   In December 2016, two (2) men were arrested for sex trafficking women out of a Best Western® in Nashville, Tennessee.[37]

ix.   In May 2016, thirty-three (33) individuals, including two (2) pastors were arrested on prostitution and trafficking charges for trafficking minors out of a Best Western® in Knoxville, Tennessee.[38]

x.   In September 2016, a man was arrested at a Best Western® in Bensalem, Pennsylvania for trafficking four women. [39]

xi.   In April 2017, two (2) people were arrested for sex trafficking a minor at a Best Western® in Denton, Maryland.[40]

xii.   In July 2017, a man was arrested after trafficking three minors at a Best Western® in Woodlawn, Maryland.[41]

xiii.    In October 2017, a sixteen (16) year old girl was rescued from a Best Western® in Arlington, Virginia, where she was being sex trafficked.[42]

xiv.   In December 2018, a husband and wife were arrested for engaging in an interstate sex trafficking scheme at a Best Western® in Portsmouth, New Hampshire.[43]

xv.   In March 2018, a man was investigated for recruiting high school students to participate in his sex trafficking ring. Police arrested him and at a Best Western® in Oklahoma City, Oklahoma with a woman he was selling for sexual favors.[44]

---

[37] https://fox17.com/community/nashville-neighborhood-watch/man-swallows-marijuana-cigarette-during-nashvilleprostitution-sting-at-hotel
[38] https://www.wspa.com/news/2-pastors-charged-with-human-trafficking-among-32-arrested-during-sting/1018484391
[39] https://patch.com/pennsylvania/bensalem/pimp-who-ran-prostitution-operation-bensalem-motel-headed-state-prison
[40] https://www.wmdt.com/2017/04/two-facing-human-trafficking-charges-for-reportedly-prostituting-child-fromdenton-hotel/
[41] https://www.baltimoresun.com/news/maryland/crime/bs-md-matthew-brown-sentencing-20170720-story.html
[42] https://www.wusa9.com/article/news/local/2-men-plead-guilty-to-two-different-child-sex-traffickingoperations/484712778
[43] https://www.seacoastonline.com/news/20181214/husband-wife-charged-in-sex-trafficking-prostitution-scheme
[44] https://www.edmondsun.com/news/prostitution-ring-targets-santa-fe-students/article_e07be414-23f2-11e8-9b32-ffcbb9a0f9aa.html

52. HYATT CORPORATION:

    a. Defendant Hyatt controls, owns, supervises, or operates the Hyatt Place® – Denver Tech Center located at 8300 E Crescent Parkway, Englewood, Colorado 80111.

    b. Hyatt failed to implement and enforce any of their own policies and protect Plaintiff J.L. from being trafficked.

    c. Founded in 1954, Hyatt represents that they have more than sixty-five (65) years of experience in managing successful brands. From all of their Hyatt Place® properties, Defendant Best Western receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

    d. Defendant Hyatt knew or should have known that the Hyatt Place® where Plaintiff J.L. was trafficked for commercial sex was an area known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff J.L. was trafficked.

    e. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant Hyatt has repeatedly failed to thwart these activities.

    f. Defendant Hyatt can exercise control over Hyatt Place® hotels by:

        i. distributing information to assist employees in identifying human trafficking;

        ii. providing a process for escalating human trafficking concerns within the organization;

        iii. requiring all employees to attend training related to human trafficking;

        iv. providing new hire orientation on human rights and corporate responsibility;

        v. providing training and education to Hyatt Place® branded hotels through webinars, seminars, conferences, and online portals;

        vi. developing and holding ongoing training sessions on human trafficking;

        vii. conducting audits of training protocols; or

      viii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

g.  Defendant Hyatt is in an agency relationship with its Hyatt Place® hotels offering public lodging services. This agency relationship was created and is maintained through Defendant Hyatt's exercise of an ongoing and systemic right of control over Hyatt Place® hotels by Defendant Hyatt's operations, including the means and methods of how Hyatt Place® hotels conduct daily business including:

      i.  hosting online bookings on Defendant Hyatt's domain;

      ii.  requiring Hyatt Place® hotels to use Defendant Hyatt's customer rewards program;

      iii.  setting parameters on employee wages;

      iv.  making employment decisions;

      v.  advertising for employment;

      vi.  sharing profits;

      vii.  standardized training methods for employees;

      viii.  building and maintaining the facility in a manner specified by Hyatt;

      ix.  standardized or strict rules of operation;

      x.  regular inspection of the facility and operation by Hyatt;

      xi.  fixing prices; or

      xii.  other actions that deprive Hyatt Place® hotels of any independence in their business operations.

h.  Apparent agency also exists between Defendant Hyatt and Hyatt Place® hotels. Defendant Hyatt holds out Hyatt Place® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

i.  Given Defendant Hyatt's public statements on behalf of its brand and the control it

assumed in educating, implementing, and directing its hotels, Defendant Hyatt breached
its duties in the following ways:

    i.   did not adequately distribute information to employees on identifying human
trafficking;

    ii.   failed to provide a process for escalating human trafficking concerns within the
organization;

    iii.   failed to mandate all managers, employees, or owners attend training on
identifying human trafficking;

    iv.   failed to provide new hire orientation on human rights and corporate
responsibility;

    v.   failed to provide training and education on human trafficking through webinars,
seminars, conferences, and online portals;

    vi.   failed to develop, hold, and require ongoing training sessions on human
trafficking; or

    vii.   failed to provide checklists, escalation protocols and information to property
management staff, or tracking performance indicators and key metrics on
human trafficking prevention.

j.   For years, Defendant Hyatt has demonstrated willful blindness to the rampant sex
trafficking occurring throughout its Hyatt Place® brand across the country. This
entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff
J.L. at a Hyatt Place® that forms the basis for this complaint.

    i.   In February 2019 two men were loudly negotiating the price of oral versus anal
sex with a prostitute while staying at the Hyatt Place in Braintree, MA.[45]

    ii.   In April 2018 a woman was murdered at the Hyatt Place Braintree, MA. The

---

[45] https://www.yelp.com/biz/hyatt-place-boston-braintree-braintree?sort_by=rating_asc

murder was tied to a sex trafficking ring in the area. [46]

    iii.  In October 2017 a woman reported that she was assaulted and forced into

        trafficking in a Hyatt Place in Bethlehem, PA.[47]

53.    WYNDHAM HOTELS AND RESORTS/LA QUINTA HOLDINGS:

    a.  Defendant Wyndham controls, owns, supervises, or operates the La Quinta® Inn &

        Suites– Denver Tech Center located at 7077 S Clinton Street, Greenwood Village,

        Colorado 80112

    b.  Wyndham, as La Quinta Holdings, Inc., failed to implement and enforce any of their

        own policies and protect Plaintiff J.L. from being trafficked.

    c.  Founded in 1968, La Quinta Holdings, Inc. had more than fifty (50) years of experience

        in managing successful brands, and founded in 1981, Wyndham has more than thirty-

        eight (38) years of experience. From all of their La Quinta® properties, Defendant

        Wyndham receives an application fee, a lump sum payment, royalties, and other

        ongoing financial benefits as La Quinta Holdings, Inc. once did.

    d.  Defendant Wyndham, as La Quinta Holdings Inc., knew or should have known that the

        La Quinta® where Plaintiff J.L. was trafficked for commercial sex was an area known

        for a high incidence of crime and prone to sex trafficking activity on and around the

        hotel premises, including when Plaintiff J.L. was trafficked.

    e.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs

        at hotels and specifically their hotels, Defendant Wyndham, as La Quinta Holdings,

        Inc., has repeatedly failed to thwart these activities.

    f.   Defendant Wyndham can exercise control over La Quinta® hotels by:

        i.  distributing information to assist employees in identifying human trafficking;

        ii.  providing a process for escalating human trafficking concerns within the

---

[46] https://www.patriotledger.com/news/20180430/murder-of-19-year-old-in-braintree-tied-to-sex-trafficking
[47] https://www.lehighvalleylive.com/bethlehem/2017/12/rape_charges_piling_up_for_all.html

organization;

   iii.  requiring all employees to attend training related to human trafficking;

   iv.  providing new hire orientation on human rights and corporate responsibility;

   v.  providing training and education to La Quinta® branded hotels through webinars, seminars, conferences, and online portals;

   vi.  developing and holding ongoing training sessions on human trafficking;

   vii.  conducting audits of training protocols; or

   viii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

g.  Defendant Wyndham, as La Quinta Holdings, Inc., is in an agency relationship with its La Quinta® hotels offering public lodging services. This agency relationship was created and is maintained through Defendant Wyndham's exercise of an ongoing and systemic right of control over La Quinta® hotels by Defendant Wyndham's operations, including the means and methods of how La Quinta® hotels conduct daily business including:

   i.  hosting online bookings on Defendant Wyndham's domain;

   ii.  requiring La Quinta® hotels to use Defendant Wyndham's customer rewards program;

   iii.  setting parameters on employee wages;

   iv.  making employment decisions;

   v.  advertising for employment;

   vi.  sharing profits;

   vii.  standardized training methods for employees;

   viii.  building and maintaining the facility in a manner specified by Hyatt;

   ix.  standardized or strict rules of operation;

   x.  regular inspection of the facility and operation by Hyatt;

      xi.   fixing prices; or

      xii.   other actions that deprive La Quinta® hotels of any independence in their business operations.

h.   Apparent agency also exists between Defendant Wyndham, as La Quinta Holdings, Inc., and La Quinta® hotels. Defendant Wyndham holds out La Quinta® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

i.   Given public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Wyndham, as La Quinta Holdings, Inc., breached its duties in the following ways:

      i.   did not adequately distribute information to employees on identifying human trafficking;

      ii.   failed to provide a process for escalating human trafficking concerns within the organization;

      iii.   failed to mandate all managers, employees, or owners attend training on identifying human trafficking;

      iv.   failed to provide new hire orientation on human rights and corporate responsibility;

      v.   failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

      vi.   failed to develop, hold, and require ongoing training sessions on human trafficking; or

      vii.   failed to provide checklists, escalation protocols and information to property management staff, or tracking performance indicators and key metrics on human trafficking prevention.

j.   For years, La Quinta Holdings, Inc., has demonstrated willful blindness to the rampant sex trafficking occurring throughout its La Quinta® brand across the country. This

entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff J.L. at a La Quinta® that forms the basis for this complaint and the successor liability Defendant Wyndham now faces.

  i. In March 2015, a Sergeant 1st Class was investigated for trafficking a woman in his battalion out of a La Quinta® in Killeen, Texas.[48]

  ii. In March 2017, three (3) men were arrested at a La Quinta® in Ventura, California for sexually trafficking a minor. [49]

  iii. In November 2017, a man and a woman were arrested at a La Quinta® in Panama City, Florida for sex trafficking another woman out of the same hotel.[50]

  iv. In December 2017, a man was arrested for trafficking a woman out of a La Quinta® in Panama City, Florida.[51]

  v. In May 2018, the manager of a La Quinta® in Tuscaloosa, Alabama was arrested for allowing human trafficking at the hotel. Police unveiled that the manager was financially profiting from sex traffickers that used her hotel.[52]

  vi. In June 2018, a man was arrested for trafficking two (2) minor girls and holding them against their will at a La Quinta® in Norcross, Georgia.[53]

  vii. In October 2018, a man was arrested after he coerced a deaf woman into a relationship with him only to sell her for sex at a La Quinta® in Austin, Texas.[54]

  viii. In November 2018, a man was arrested for trafficking a sixteen (16) year old girl for sex at a La Quinta® in Springdale, Ohio.[55]

---

[48] https://www.thedailybeast.com/inside-fort-hoods-prostitution-ring
[49] https://www.10news.com/news/3-men-arrested-accused-of-human-trafficking-forcing-teen-into-prostitution-in-san-diego
[50] https://www.newsherald.com/news/20171126/pcpd-pair-charged-with-human-trafficking-forced-prostitution
[51] https://www.wtvy.com/content/news/Dothan-man-accused-of-forcing-person-into-prostitution-in-Panama-City-467034463.html
[52] https://www.tuscaloosanews.com/news/20180517/tuscaloosa-police-charge-laquinta-inn-manager-with-human-trafficking
[53] https://www.ajc.com/news/local/gwinnett-man-charged-with-trafficking-children-for-sex-labor/hqGlERVvMI3q0uC4PEUO6O/
[54] https://www.kxan.com/news/local/austin/man-arrested-for-allegedly-forcing-a-deaf-woman-into-prostitution/1515032988
[55] https://www.wcpo.com/news/crime/man-found-guilty-of-trafficking-underage-girl-for-sex

ix.   In December 2018, a number of Chinese women were being sexually trafficked by a married couple through a La Quinta® in South Burlington, Vermont. [56]

x.   An April 2018 report showed hotels in the Hudson Valley that have high rates of sex trafficking and the La Quinta® in Westchester, New York had thirty-seven (37) trafficking calls in 24 months.[57]

xi.   In April 2019, a man trafficked a minor through a La Quinta® in Sarasota, Florida.

54.   MARRIOTT INTERNATIONAL

a.   Defendant Marriott controls, owns, supervises, or operates the Sheraton® – Denver Tech Center located at 7007 S Clinton St, Greenwood Village, Colorado 80112.

b.   Marriott failed to implement and enforce any of their own policies and protect Plaintiff J.L. from being trafficked.

c.   Founded in 1927, Marriott represents that they have more than Ninety-two (92) years of experience in managing successful brands. From all of their Sheraton® properties, Defendant Marriott receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

d.   Defendant Marriott knew or should have known that the Sheraton® where Plaintiff J.L. was trafficked for commercial sex was an area known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff J.L. was trafficked.

e.   Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant Marriott has repeatedly failed to thwart these activities.

---

[56] https://www.wcax.com/content/news/NH-couple-accused-of-enticing-Chinese-into-sex-trafficking-502787462.html
[57] http://westchester.news12.com/story/38003438/slavery-in-suburbia-sex-trafficking-of-children-flourishing-in-the-hudson-valley

f.   Defendant Marriott can exercise control over Sheraton® hotels by:

    i.   distributing information to assist employees in identifying human trafficking;

    ii.   providing a process for escalating human trafficking concerns within the organization;

    iii.   requiring all employees to attend training related to human trafficking;

    iv.   providing new hire orientation on human rights and corporate responsibility;

    v.   providing training and education to Sheraton® hotels through webinars, seminars, conferences, and online portals;

    vi.   developing and holding ongoing training sessions on human trafficking;

    vii.   conducting audits of training protocols; or

    viii.   Providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

g.   Defendant Marriott is in an agency relationship with its Sheraton® hotels offering public lodging services. This agency relationship was created and is maintained through Defendant Marriott's exercise of an ongoing and systemic right of control over Sheraton® hotels by Defendant Marriott's operations, including the means and methods of how Sheraton® hotels conduct daily business including:

    i.   hosting online bookings on Defendant Marriott's domain;

    ii.   requiring Hyatt Place® hotels to use Defendant Marriott's customer rewards program;

    iii.   setting parameters on employee wages;

    iv.   making employment decisions;

    v.   advertising for employment;

    vi.   sharing profits;

    vii.   standardized training methods for employees;

      viii.  building and maintaining the facility in a manner specified by Marriott;

      ix.  standardized or strict rules of operation;

      x.  regular inspection of the facility and operation by Marriott;

      xi.  fixing prices; or

      xii.  other actions that deprive Sheraton® hotels of any independence in their business operations.

h.  Apparent agency also exists between Defendant Marriott and Sheraton® hotels. Defendant Marriott holds out Sheraton® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

i.  Given Defendant Marriott's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Marriott breached its duties in the following ways:

      i.  did not adequately distribute information to employees on identifying human trafficking;

      ii.  failed to provide a process for escalating human trafficking concerns within the organization;

      iii.  failed to mandate all managers, employees, or owners attend training on identifying human trafficking;

      iv.  failed to provide new hire orientation on human rights and corporate responsibility;

      v.  failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

      vi.  failed to develop, hold, and require ongoing training sessions on human trafficking; or

      vii.  failed to provide checklists, escalation protocols and information to property management staff, or tracking performance indicators and key metrics on

human trafficking prevention.

j.  For years, Defendant Marriott has demonstrated willful blindness to the rampant sex trafficking occurring throughout its Sheraton® brand across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff J.L. at a Sheraton® that forms the basis for this complaint.

    i.  In November 2013, a man was sentenced to twenty (20) years for trafficking a nineteen (19) year old girl and another woman out of a Sheraton in Towson, MD.

    ii.  In February 2019, three people were arrested for trafficking a sixteen (16) year old girl out of a Sheraton in New Orleans, Louisiana, where she had been beaten, drugged and raped.

    iii.  An August 2017 report from data out of Houston's Police Department shows that some of Houston's highest rated hotels have topped a list of locations where prostitution arrests were made, including the Sheraton.

    iv.  In May 2013 undercover police officers revealed a high-end call girl sting operating in the Sheraton at keystone at the crossing, Indianapolis. [58]

    v.  In January 2017 a man reported brazen prostitution at the Sheraton Sao Paulo WTC Hotel bar. He even saw the night manager kissing one of the prostitutes offering her services to the guests. [59]

    vi.  In January 2014 two woman were arrested on prostitution charges at the Sheraton Pentagon City, 900 S. Orme St.[60]

    vii.  In November 2017 a man and a woman were arrested on prostitution charges in

---

[58] https://www.wthr.com/article/police-break-up-high-end-prostitution-ring-at-indianapolis-hotel
[59] https://www.tripadvisor.com/ShowUserReviews-g303631-d306521-r453167102-Sheraton_Sao_Paulo_WTC_Hotel-Sao_Paulo_State_of_Sao_Paulo.html
[60] https://patch.com/virginia/arlington-va/two-handed-prostitution-charges-at-pentagon-city-hotel

the Sheraton on Meadow Ave. Lancaster, PA.[61]

viii.   In June, 2014 nine woman were arrested as part of prostitution and human

trafficking bust. They were found on the third floor of the Sheraton Hotel in

Pittsburgh.[62]

### D.  THE SEX TRAFFICKING OF J.L.

55.    The facts alleged herein stem from a sex trafficking ring operating in Denver, Colorado.  While

victimized by her traffickers, J.L. was subject to rape, physical abuse, verbal abuse, exploitation,

psychological torment, kidnapping, and false imprisonment at the Defendants' hotels.

56.    A victim of parental kidnapping and the child of a volatile home, J.L. had started using heroin

during her parents' gruesome custody battle in a teenager's desperate attempt to escape an all too difficult

reality.  When she was returned to her father's custody in her native Colorado, J.L. overcame her addiction

and attained sobriety. However, J.L. relapsed and overdosed triggering a course of court-mandated

treatment. While J.L. found sobriety again, she inadvertently missed one day of treatment and feared the

worst of consequences when a warrant was issued after her absence. In 2016, at just seventeen (17) years

old, J.L. ran away from her father's custody out of an overwhelming fear that she had become too much of

burden on him and was going to be removed by Children's Services regardless.

57.    Homeless in Denver, J.L. was introduced by her friend to a man who promised that he could help

J.L. make money to support herself. The man brought J.L. to his room at the Best Western® Plus at the

Denver Tech Center, located at 9231 E Arapahoe Rd.

58.    Inside the Best Western® Plus, the man immediately bludgeoned J.L. with a gun rendering her

completely unconscious.  He stripped her nude, tied her to the bed, raped her, and posted naked photos of

her online at Backpage.com advertising her for commercial sex. She awoke restrained to a bed,

completely naked with three armed men standing guard, and an aching pain in her abdomen.

---

[61] https://cseinstitute.org/arrest-couple-south-scranton-hotel-results-prostitution-drug-charges/
[62] https://www.post-gazette.com/local/city/2014/06/21/9-women-charged-with-prostitution-related-counts-in-Pittsburgh-sting/stories/201406210127

59.   In the days to follow, under the constant watch of armed guards J.L. was shuttled throughout the Denver Tech Center and forced by her trafficker to sexually service numerous buyers at the various hotels within its limits in response to advertisements for commercial sex that her trafficker posted on www.backpage.com against her will.[63]

60.   J.L. was rarely able to leave the Defendants' hotel rooms without an armed escort, who was assigned by her trafficker. J.L.'s trafficker was also sure to make it clear to her that he was always carrying a firearm. J.L.'s trafficker also frightened her into submission by threatening to harm her seven (7) year old sister and other family members. These factors combined with what he had already done to J.L. made escaping her trafficker a seemingly insurmountable task.

61.   At the Best Western® Plus, just a few days into her ordeal, J.L. was injured so badly by a buyer that she knew it was noticeable to the public. The buyer sexually and physically assaulted J.L. and slammed her head so hard against a dresser that the dresser was damaged. J.L. was screaming so loudly throughout this incident that her trafficker decided to move her to a different hotel.

62.   The buyers would arrive at the Best Western® Plus enter through the front entrance and J.L.'s trafficker or one of his partners would meet them in the lobby and escort them upstairs. J.L. was forced to sexually service in excess of six (6) buyers a day. Each man entering and exiting the room and the Best Western® Plus as an unannounced guest.

63.   J.L. had arrived at the Best Western® Plus in the evening with no luggage and did not leave until days later, in the same clothes she had arrived in and visibly injured.

64.   Especially because they left so abruptly, the room at the Best Western® Plus was left with an astounding number of used condoms scattered about and a broken dresser with J.L.'s blood on it.

65.   J.L. also observed that the Best Western® Plus had numerous surveillance cameras and her trafficker always paid for the room one night at a time and always paid in cash.

---

[63] Backpage.com was the leading online marketplace for commercial sex, until it was seized by the federal authorities in April 2018. Backpage.com operated in 97 countries and 943 locations worldwide—and was last valued at more than a half-billion dollars. See STAFF OF PERMANENT SUBCOMMITTEE ON INVESTIGATIONS; 118TH CONG., REP. ON BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING (Comm. Print 2017).

66.   J.L. was kept longest at the La Quinta® Inn & Suites located at 7077 S Clinton Street, Greenwood Village, Colorado 80112.  When her trafficker checked in her and his partners he again paid for the room in cash and continued to add nights for a couple of weeks.  J.L. directly interacted with the front desk staff, she was wearing clothing that was days old, visibly withdrawn, avoiding all eye contact, and checking in alone with three (3) men at only seventeen (17) years old.

67.   At the La Quinta® Inn & Suites J.L. was forced to sexually service in excess of six (6) buyers a day, each entering through the front door of the hotel. At first, J.L.'s trafficker or one of his partners would wait in the lobby to escort the buyers to J.L.'s room, but after some time J.L. had to go with an escort to greet the buyer in the lobby and bring them to the room herself.  The foot traffic to the rooms was constant and voluminous and the front desk staff of the La Quinta® Inn & Suites had a constant view of this behavior for over two (2) weeks.

68.   During her time at the La Quinta® Inn & Suites, J.L. was prohibited from leaving her room without her trafficker or one of his armed enforcers by her side. As a result, the room was constantly occupied and when maid service came around J.L.'s trafficker would refuse them. When J.L.'s trafficker did take her out of the room, which happened at least once when he took her to buy clothing after she had spent over a week in the same garments, maid service did clean the room in their absence.  Inside the room at the La Quinta® Inn & Suites maid service would have observed abundant used condoms scattered across the various surfaces of the room.

69.   The La Quinta® Inn & Suites also offered a free breakfast that J.L.'s trafficker brought her to every morning.  Appearing strange, J.L. would eat silently in her trafficker's overbearing presence, wearing the same clothes, and looking down as if by force.

70.   J.L. was repeatedly physically and sexually assaulted by buyers at the La Quinta® Inn & Suites. On one occasion the front desk called and asked J.L.'s trafficker if everyone was okay because they had received noise complaints. In the end, the front desk simply switched J.L.'s room.

71.   At the Hyatt Place® located at 8300 E Crescent Parkway, Englewood, Colorado 80111, J.L. was again forced to sexually service in excess handfuls of buyers per day. Each man entered and exited the

Hyatt Place® through the front doors as an unannounced and non-paying guest. They were met by J.L. and her trafficker or one of his enforcers in the hotel's lobby and escorted to the room, the resulting foot traffic to J.L.'s room was constant and voluminous.

72.   The room was constantly occupied, because J.L. was prohibited from leaving, and when maid service came around J.L.'s trafficker would refuse them.

73.   On one occasion at the Hyatt Place® J.L.'s trafficker tried to forcefully inject her with heroin as his partners held her down. J.L. had been completely sober for months and screamed as loud as she could to stop them any way possible. The volume of her cry stopped her trafficker but made him change their hotel again out of fear of exposure.

74.   J.L.  arrived at the Sheraton® with three (3) much older men, the buyers would arrive at the Best Western® Plus enter through the front entrance and J.L.'s trafficker or one of his partners would meet them in the lobby and escort them upstairs. J.L. was forced to sexually service in excess of six (6) buyers a day. Each man entering and exiting the room and the Best Western® Plus as an unannounced guest.

75.   J.L. had arrived at the Best Western® Plus in the evening with no luggage and did not leave until days later, in the same clothes she had arrived in and visibly injured.

76.   Especially because they left so abruptly, the room at the Best Western® Plus was left with an astounding number of used condoms scattered about and a broken dresser with J.L.'s blood on it.

77.   J.L. also observed that the Best Western® Plus had numerous surveillance cameras and her trafficker always paid for the room one night at a time and always paid in cash.

78.    Prior to, during, and following the incidents described herein, the Defendants had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. The Defendants failed to take any actions to curtail these activities.

79.    Had the Defendants been paying attention to the activities being conducted at their hotels and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of J.L.

## E.  THE DEFENDANTS FACILITATED THE TRAFFICKING OF J.L.

80.    Best Western, Hyatt, Wyndham, and Marriott profited from the sex trafficking of J.L. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendants leased rooms to J.L.'s traffickers, when they knew, or should have known, that he was using their room to imprison J.L., physically assault her, and subject her to repeated exploitation as he forced her into sexual servitude.

81.    Best Western, Hyatt, Wyndham, and Marriott knew, or should have known, that J.L. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because J.L.'s trafficker frequented the Defendants' hotels.

82.    Best Western, Hyatt, Wyndham, and Marriott knew, or should have known, that J.L. was being trafficked because J.L. was arrested on property grounds, constantly entertained traffic to appease her traffickers' daily quotas, and her traffickers would help check her in then not proceed to the room; behavior that indicated they were using the Defendants' hotels for his illegal sex trafficking venture.

83.    Defendants Best Western, Hyatt, Wyndham, and Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to J.L.'s trafficker in which to harbor J.L. while he was trafficking her.

84.    Defendants Best Western, Hyatt, Wyndham, and Marriott profited from the sex trafficking of J.L. and knowingly or negligently aided and participated with J.L.'s trafficker in his criminal venture. The Defendants took no action as J.L. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment, and often displaying prominent bruising all over her person.

85.    Defendants Best Western, Hyatt, Wyndham, and Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from J.L. in which to harbor J.L. while she was being trafficked.

86.    The Defendants all had the opportunity to stop J.L.'s trafficker and offenders like him from victimizing J.L. and others like her.  Instead, every Defendant failed to take reasonable measures to stop

sex trafficking from occurring in their hotels.

87.    The Defendants all financially benefited from the sex trafficking of J.L., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

88.    Best Western, Hyatt, Wyndham, and Marriott enjoy the steady stream of income that sex traffickers bring to their hotels.

89.    Best Western, Hyatt, Wyndham, and Marriott financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

90.    The Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

91.    The Defendants maintained their deficiencies to maximize profits by:

   a.   Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

   b.   Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

   c.   Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

92.    As a direct and proximate result of these egregious practices on the part of the Defendants, J.L. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A.  COUNT ONE – 18 U.S.C §1595 ("TVPRA")

93.    The Plaintiff J.L. incorporates each foregoing allegation.

94.    J.L. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

95.    The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a).  At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of J.L. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

96.    The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, the Defendants directly benefitted from the trafficking of J.L. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of J.L.'s injuries and damages.

97.    J.L. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591 (a).

## PRAYER FOR RELIEF

WHEREFORE based on the forgoing the Plaintiff seeks injunctive relief in the form of a judgement requiring the Defendants to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising  umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated  to the Plaintiff herein.

AND WHEREFORE on the basis of the foregoing, the Plaintiff requests that  a  jury  be

selected to hear this case and render a verdict for the Plaintiff, and against the Defendant, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendant's wrongs and injuries to the Plaintiff due to the Defendant's faulty conduct, including but not limited to:

    a.   All available compensatory damages for the described losses with respect to each cause of action;

    b.   past and future medical expenses, as well as the costs associated with past and future life care;

    c.   past and future lost wages and loss of earning capacity;

    d.   past and future emotional distress;

    e.   consequential and/or special damages;

    f.   all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    g.   punitive damages with respect to each cause of action;

    h.   reasonable and recoverable attorneys' fees;

    i.   costs of this action; and

    j.   pre-judgment and all other interest recoverable

Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated: December 30, 2019

**RESPECTFULLY SUBMITTED,**

**PLAINTIFF,**
**By Her Attorneys,**

  s/ C.J. Cuneo

C.J. Cuneo (CO Bar No. 52041)
Andrus Wagstaff, PC
7171 W Alaska Drive
Lakewood, CO 80226
Phone: (303) 376-6360
Fax: (303) 376-6361
Cj.cuneo@andruswagstaff.com

# EXHIBIT A



## Who We Are

The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's (DHS) efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.

## What's Inside?

This **toolkit** offers tips and resources that can help you inform and educate your employees about human trafficking.

It includes **posters** of human trafficking warning signs for four groups of employee:

- Hotel and Motel Staff
- Housekeeping, Maintenance and Room Staff
- Concierge, Bellman, Front Desk, Security and Valet Staff
- Food and Beverage Staff

These posters can be displayed in common areas of your business where employees congregate (such as staff break, laundry and maintenance rooms).

www.dhs.gov/bluecampaign



# What is Human Trafficking?

Human trafficking is modern-day slavery and involves the use of force, fraud or coercion to obtain labor or commercial sex. Every year, millions of men, women and children are trafficked in countries around the world, including the United States.

There are different types of human trafficking:

- **Sex Trafficking**
  Victims of sex trafficking are manipulated or forced to engage in sex acts for someone else's commercial gain. Sex trafficking is not prostitution.

  Anyone under the age of 18 engaging in commercial sex is considered to be a victim of human trafficking. **No exceptions.**

- **Forced Labor**
  Victims of forced labor are compelled to work for little or no pay, often manufacturing or growing the products we use and consume every day.

- **Domestic Servitude**
  Victims of domestic servitude are forced to work in isolation and are hidden in plain sight as nannies, housekeepers or domestic help.

## Human trafficking and the hospitality industry

Traffickers often take advantage of the privacy and anonymity offered by the hospitality industry. They can operate discreetly because staff and guests may not know the signs of human trafficking.

You may have employees who are victims of forced labor. If a third party applied for a position on behalf of an individual or if employees are not receiving their own paychecks, these could be signs of human trafficking.

Hotels and motels are also major locations where traffickers force sex trafficking victims to provide commercial sex to paying customers. Victims may be forced to stay at a hotel or motel where customers come to them, or they are required to go to rooms rented out by the customers.

## What actions can I take at my business to help stop human trafficking?

You play a significant role in helping to stop this terrible crime by:

- Knowing the signs of human trafficking.
- Designing a plan of action to respond to reports of human trafficking in your business.
- Partnering with agencies that provide services to victims of human trafficking. In the case of lodging, consider offering vouchers to victims. Immediate housing for victims plays a vital role in beginning a victim's healing process.
- Providing employee training to help them understand and identify signs of human trafficking.
- Distributing and posting the fact sheets in this kit to your employees.

Information on additional resources, literature, materials, and training offered by the Blue Campaign can be found at www.dhs.gov/bluecampaign.





For **Hotel** and **Motel** Staff

Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims.

### GENERAL INDICATORS

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.

- Individuals show signs of physical abuse, restraint, and/or confinement.

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.

- Individuals lack freedom of movement or are constantly monitored.

- Individuals avoid eye contact and interaction with others.

- Individuals have no control over or possession of money or ID.

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party.

- Individuals have few or no personal items—such as no luggage or other bags.

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males.

- A group of girls appears to be traveling with an older female or male.

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

- Follow your corporate protocol, such as by notifying management and security.

- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





For **Housekeeping, Maintenance,** and **Room Service** Staff

Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims.

### GENERAL INDICATORS

- "Do Not Disturb" sign used constantly.
- Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/motel staff entry into room.
- Refusal of cleaning services for multiple days.
- Excessive amounts of cash in a room.
- Smell of bodily fluids and musk.
- Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.
- The same person reserving multiple rooms.
- Individuals leaving room infrequently, not at all, or at odd hours.
- Children's items or clothing are present but no child registered with the room.

- Individuals loitering in hallways or appearing to monitor the area.
- Excessive amounts of alcohol or illegal drugs in rooms.
- Evidence of pornography.
- Minors left alone in room for long periods of time.
- Excessive number of people staying in a room.
- Extended stay with few or no personal possessions.
- Provocative clothing and shoes.
- Constant flow of men into a room at all hours.
- Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.).
- Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





For **Concierge, Bellman, Front Desk, Security,** and **Valet** Staff

Concierge, bellman, front desk, security, and valet staff are typically the first to see guests when they enter the hotel. When checking in or requesting hotel amenities, a guest may exhibit behavior indicating human trafficking.

### GENERAL INDICATORS

- Patrons checking into room appear distressed or injured.
- The same person reserving multiple rooms.
- Few or no personal items when checking in.
- Room paid for with cash or pre-loaded credit card.
- Excessive use of hotel computers for adult oriented or sexually explicit websites.
- Patrons not forthcoming about full names, home address or vehicle information when registering.
- Minor taking on adult roles or behaving older than actual age (paying bills, requesting services).
- Patron appears with a minor that he or she did not come with originally.
- Rentals of pornography when children are staying in the room.
- Individuals dropped off at the hotel or visit repeatedly over a period of time.

- Individuals leaving room infrequently, not at all, or at odd hours.
- Minor with a patron late night or during school hours (and not on vacation).
- Individuals checking into room have no identification.
- Room is rented hourly, less than a day, or for long-term stay that does not appear normal.
- Patrons request information or access to adult services or sex industry.
- Room rented has fewer beds than patrons.
- Individuals selling items to or begging from patrons or staff.
- Individuals enter/exit through the side or rear entrances, instead of the lobby.
- Car in parking lot regularly parked backward, so the license plate is not visible.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- **Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.**

- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

- Follow your corporate protocol, such as by notifying management and security.

- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





Food and beverage staff may have access to a guest's room or see them using the hotel restaurant or bar. Be conscious of these signs indicating a guest may be a victim of human trafficking.

**GENERAL INDICATORS**

- Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.
- Patron claims to be an adult although appearance suggests he/she is a minor.
- Individuals loitering and soliciting male patrons.
- Individuals waiting at a table or bar and picked up by a male (trafficker or customer).
- Individuals asking staff or patrons for food or money.
- Individuals taking cash or receipts left on tables.

*Each indicator alone may not necessarily mean a person is being trafficked.*

**WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING**

🚫 Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

❗ Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

💬 Follow your corporate protocol, such as by notifying management and security.

🛡 Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

☎ To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign