IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 19-cv-03713-PAB-STV

J.L., an individual,

     Plaintiff,

v.

BEST WESTERN INTERNATIONAL, INC.,
HYATT CORPORATION,
WYNDHAM HOTELS AND RESORTS, INC., and
MARRIOTT INTERNATIONAL, INC.

     Defendants.

---

## ORDER

---

     This matter is before the Court on motions to dismiss plaintiff's first amended complaint, Docket No. 65, filed by Wyndham Hotels and Resorts, Inc. ("Wyndham") [Docket No. 69], Marriott International, Inc. ("Marriott") [Docket No. 70], Select Hotels Group, LLC[1] ("Hyatt") [Docket No. 72], and Best Western International, Inc. ("Best Western") [Docket No. 71].  Plaintiff responded to each of these motions.  Docket Nos. 75, 73, 77, 74, respectively.  Defendants replied.  Docket Nos. 84, 83, 81, 82, respectively.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

---

[1] As discussed below, Select Hotels Group, LLC states that it has been improperly named as "Hyatt Corporation" and that "[t]he entity implicated by Plaintiff's allegations – Select Hotels Group, LLC ("SHG") – still has not been served."  Docket No. 72 at 3 n.1.

## I. BACKGROUND[2]

Plaintiff alleges that she was "trafficked for commercial sex" at age seventeen in Denver, Colorado after running away from her father.  Docket No. 65 at 2, ¶ 7.  While homeless, plaintiff's friend introduced her to a man who promised to help her make money to support herself.  *Id.*  He brought her to a room at the Best Western Plus at the Denver Tech Center; however, once inside, he "bludgeoned [her] with a gun[,] rendering her completely unconscious, then stripped her nude, tied her to the bed, raped her, and posted naked photos of her online at Backpage.com advertising her for commercial sex."  *Id.* at 3.  Plaintiff was then "shuttled throughout the Denver Tech Center" under "the seemingly constant watch of an armed guard" and was "forced by her trafficker to sexually service numerous buyers at the various hotels within [the Denver Tech Center's] limits."  *Id.*  Plaintiff was "imprisoned" for over a month before agents from the Federal Bureau of Investigation recovered her.  *Id.*

Plaintiff brings this action for damages under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA").  *Id.* at 2, ¶ 6.  She alleges that each defendant hotel company, "in violation of 18 U.S.C. § 1595, knowingly benefited from a venture they knew, or should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1595(a)."  *Id.* at 3, ¶ 8.  Plaintiff claims that her trafficking, torture, and sexual exploitation occurred at the Best Western Plus, Hyatt Place, La Quinta Inn & Suites, and Sheraton hotels in the Denver Tech Center and that, as a direct and proximate result of defendants' refusal to prevent human trafficking at

---

[2] The facts are taken from plaintiff's first amended complaint [Docket No. 65] and are presumed to be true for the purposes of this order.

these properties, she was sexually exploited and repeatedly victimized. *Id.*, ¶¶ 9–10. Each of these hotel companies, plaintiff alleges, "knowingly profited from sex trafficking ventures that compelled and sustained Plaintiff in sexual servitude and [are], therein, liable for the injuries inflicted upon Plaintiff by her traffickers due to [their] failure as innkeepers to exercise diligence consistent with a duty of care, let alone a heightened duty of care." *Id.* at 3–4, ¶¶ 11–14. Had the defendants exercised diligence, they would have discovered "the horrific acts that were being committed at [their] brand hotel. Thus, [they] conspired, enabled, and otherwise worked together [with plaintiff's traffickers] in the abuse and exploitation of Plaintiff in keeping her invisible." *Id.* at 4, ¶ 12.

Plaintiff's general allegations about each of the defendants are similar. Plaintiff alleges that each defendant "controls the training and policies for its branded properties including the . . . hotel[s] where [plaintiff] was trafficked." *Id.* at 5, ¶ 16.b (Best Western); at 6, ¶ 18.b (Hyatt); at 8, ¶ 20.d (Wyndham); at 10, ¶ 22.d (Marriott). For each company, plaintiff alleges that "[b]y and through [the company's] relationship with the staff at the [property] where [plaintiff] was trafficked, and the perpetrator who trafficked [her] at the [property] while registered as a guest there," the defendant "knowingly benefited, or received [something] of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking." *Id.* at 5, ¶ 16.c (Best Western); at 7, ¶ 18.c (Hyatt); at 8–9, ¶ 20.f (Wyndham); at 10, ¶ 22.e (Marriott).

Further, plaintiff alleges that each defendant "receives a percentage of the gross room revenue from the money generated by the operations [of each company's] hotels,

including a percentage of the revenue generated from the rate charged for the rooms in which Plaintiff was sex trafficked." *Id.* at 5–6, ¶ 16.d (Best Western); at 7, ¶ 18.d (Hyatt); at 9, ¶ 20.g (Wyndham); at 10–11, ¶ 22.f (Marriott).

Plaintiff claims that Best Western "owns, supervises, and/or operates the Best Western Plus – Denver Tech Center, located at 9231 E Arapahoe Road, Greenwood Village, Colorado 80112," *id.* at 6, ¶ 16.e, and that Hyatt "owns, supervises, and/or operates the Hyatt Place Denver Tech Center located at 8300 E Crescent Parkway, Englewood, Colorado 80111." *Id.* at 7, ¶ 18.e.  As to Wyndham, plaintiff alleges that Wyndham is the successor to Wyndham Worldwide Corporation and that, as of 2018, La Quinta Holdings, Inc. is a wholly owned subsidiary of Wyndham; therefore, La Quinta is a Wyndam brand property.  *Id.* at 8, ¶¶ 20.a–c.  She states that Wyndham "owns, supervises, and/or operates the La Quinta Inn & Suites – Denver Tech Center located at 7077 S Clinton Street, Greenwood Village, Colorado 80112."  *Id.* at 9, ¶ 20.h.  As to Marriott, plaintiff alleges that Marriott is the successor to Starwood Hotels and Resorts Worldwide, Inc. and that Starwood Hotels and Resorts, LLC, formerly known as Starwood Hotels and Resorts Worldwide, Inc. is a wholly owned subsidiary of Marriott; therefore, Sheraton is a Marriott brand property.  *Id.* at 10, ¶¶ 22.a–c.  Plaintiff alleges that Marriott "owns, supervises, and/or operates the Sheraton Denver Tech Center located at 7007 S Clinton Street, Greenwood Village, Colorado 80112."  *Id.* at 11, ¶ 22.g.

Plaintiff states that, upon information and belief, each Best Western Plus, Hyatt Place, and La Quinta Inn pays "around 10% of its total revenue back" to its parent

company.  *Id.* at 22, ¶ 86 (Best Western); ¶ 88 (Hyatt); ¶ 90 (Wyndham).  Marriott, however, plaintiff alleges, "exercises actual control over its franchisees through control over the brand standards."  *Id.* at 23, ¶ 94.

Plaintiff alleges, upon information and belief, that each defendant took "inadequate measures to prevent sex trafficking at its brand hotels and instead profited from sex trafficking at their brand hotels."  *Id.* at 16, ¶ 55.  She states that each defendant "received information indicating sex trafficking had occurred at one of its brand hotels" and "had the financial resources to train hotel staff to identify the signs of sex trafficking."  *Id.* at 17, ¶¶ 60, 62.  Further, plaintiff alleges that the civil action provision of the TVPRA, 18 U.S.C. § 1595, "effectively require[s] all companies with a peculiar proximity to human trafficking for commercial sex, including Defendants, to use reasonable measure to conduct proactive audits to ensure that they were not profiting from what they *should know* are human trafficking ventures."  *Id.* at 19, ¶ 71.

Plaintiff says that she arrived at the Best Western in the Tech Center one evening with no luggage and did not leave until days later, in the same clothes as when she arrived, and visibly injured.  *Id.* at 47, ¶ 114.  She states that she was "forced to sexually service" six "buyers" per day, who would arrive at the Best Western through the front door and be escorted to plaintiff's room by one of plaintiff's traffickers.  *Id.*, ¶ 113. In one incident, she was "injured so badly by a buyer who . . . slammed her head so hard against a dresser that the dresser was damaged[, and plaintiff] was screaming so loudly . . . that her trafficker decided to move her to a different hotel."  *Id.*, ¶ 112. Plaintiff alleges that, when she left the hotel, staff would have seen "an astounding

number of used condoms scattered about and a broken dresser with [plaintiff's] blood on it."  *Id.*, ¶ 115.

At the La Quinta, plaintiff was also forced to service six buyers per day, each of whom also entered through the front door.  *Id.* at 47–48, ¶ 118.  Plaintiff states that the foot traffic to her room was "constant and voluminous" and that the front desk staff had "a constant view of this behavior for two (2) weeks."  *Id.* at 48, ¶ 118.  While her traffickers would refuse regular maid service, plaintiff states that, on at least one occasion, she was taken to buy new clothes.  *Id.*, ¶ 119.  Plaintiff states that, when she was out of the hotel, maids would have seen "abundant used condoms scattered across the various surfaces of the room."  *Id.*  Plaintiff further states that, at one point, the front desk called plaintiff's room to ask her trafficker if "everyone was okay because they had received noise complaints."  *Id.*, ¶ 121.  Following the noise complaint, the front desk switched plaintiff's room.  *Id.*

Plaintiff's sole allegation about what happened at the Sheraton is that she "arrived at the Sheraton with three (3) much older men."  *Id.* at 49, ¶ 125.

Events were similar at the Hyatt Place as they were at the Best Western and La Quinta; however, on one occasion a trafficker "tried to forcefully inject [plaintiff] with heroin as his partners held her down."  *Id.*, ¶ 124.  Plaintiff, who had been sober for months, "screamed as loud[ly] as she could to stop them in any way possible."  *Id.*  She succeeded in stopping her trafficker, but he changed hotels again out of fear of exposure.  *Id.*

Plaintiff brings one claim of relief against each defendant for violating the

6

TVPRA.  *Id.* at 52–55, ¶¶ 144–63.  She seeks injunctive relief in the form of a judgment requiring defendants to institute sufficient audits, policies, and rules so that all employees and agents of their franchisees insure that actions like those perpetrated against plaintiff no longer occur.  *Id.* at 55–56.  She also seeks compensatory and punitive damages.  *Id.* at 56.

## II. LEGAL STANDARDS

### A.  Rule 8

Rule 8 "serves the important purpose of requiring plaintiffs to state their claims intelligibly so as to inform the defendants of the legal claims being asserted."  *Mann v. Boatwright*, 477 F.3d 1140, 1148 (10th Cir. 2007).  Accordingly, Rule 8(a)(2) requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Similarly, Rule 8(d)(1) requires each allegation in the complaint to be "simple, concise, and direct."  A complaint violates Rule 8 when it is "virtually impossible to understand" or "completely lacking in clarity and intelligibility."  *See Mitchell v. City of Colo. Springs, Colo.*, 194 F. App'x 497, 498 (10th Cir. 2006) (unpublished); *see also Mann*, 477 F.3d at 1148 (describing a complaint as violating Rule 8 if it "neither identifies a concrete legal theory nor targets a particular defendant").  Dismissal of a complaint without prejudice for failure to comply with Rule 8 is "within the sound discretion of the trial court."  *Carbajal v. City and Cnty. of Denver*, 502 F. App'x 715, 716 (10th Cir. 2012) (unpublished) (citing *Atkins v. Nw. Airlines, Inc.*, 967 F.2d 1197, 1203 (8th Cir. 1992)).

**B.  Rule 12(b)(2)**

The purpose of a motion to dismiss under Rule 12(b)(2) of the Federal Rules of

Civil Procedure is to determine whether the Court has personal jurisdiction.  The plaintiff

bears the burden of establishing personal jurisdiction over defendant.  *Rambo v. Am. S.*

*Ins. Co.*, 839 F.2d 1415, 1417 (10th Cir. 1988).  The plaintiff can satisfy its burden by

making a prima facie showing of personal jurisdiction.  *Dudnikov v. Chalk & Vermillion*

*Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).  The Court will accept the well-

pleaded allegations of the complaint as true to determine whether plaintiff has made a

prima facie showing that personal jurisdiction exists.  *AST Sports Sci., Inc. v. CLF*

*Distrib. Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008).  If the presence or absence of

personal jurisdiction can be established by reference to the complaint, the Court need

not look any further.  *Id*.  The plaintiff, however, may also make this prima facie showing

by putting forth evidence that, if proven to be true, would support jurisdiction over the

defendant.  *Dudnikov*, 514 F.3d at 1070.  "[A]ny factual disputes in the parties' affidavits

must be resolved in plaintiffs' favor."  *Id*.

Personal jurisdiction comports with due process where a defendant has

minimum contacts with the forum state and where those contacts are such that

jurisdiction does not offend "traditional notions of fair play and substantial justice."  *Int'l*

*Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Minimum contacts may be

established under the doctrines of general jurisdiction or specific jurisdiction.  Where

general jurisdiction is asserted over a non-resident defendant who has not consented to

suit in the forum, minimum contacts exist if the plaintiff demonstrates that the defendant

maintains "continuous and systematic general business contacts" in the state.  *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998).  Specific jurisdiction is present where the defendant has purposefully directed its activities at the residents of the forum and the litigation results from injuries that arise out of or relate to those activities.  *Soma Med. Int'l v. Stand. Chartered Bank*, 196 F.3d 1292, 1298 (10th Cir. 1999).

### C.  Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with his allegations.  *Cory v. Allstate Ins.*, 584 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation omitted)).  Otherwise, the Court need not accept conclusory allegations.  *Moffet v.*

*Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

### III.  The Trafficking Victims Protection Reauthorization Act

Congress enacted the Trafficking Victims Protection Act in 2000, creating criminal offenses for forced labor and sex trafficking.  Pub. L. No. 106-386, 114 Stat. 1464 (2000).  The original Act did not contain a private right of action.  *Griffin v. Alamo*, 2016 WL 7391046, at *2 (W.D. Ark. Dec. 21, 2016).  In 2003, however, Congress added a civil right of action for victims to sue their traffickers.  In 2008, Congress further amended the law to permit victims to sue those who facilitate trafficking ventures.  Pub. L. No. 108-193, 117 Stat. 2875 (2003).  The 2008 law provides

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (*or whoever knowingly benefits, financially*

*or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter*) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a) (emphasis added).

To state a claim under a § 1595(a) beneficiary theory, a plaintiff must allege facts from which it can reasonably inferred that a defendant (1) "knowingly benefit[ted] financially or by receiving anything of value" (2) from participation in a venture that defendant "knew or should have known has engaged in" sex trafficking.  18 U.S.C. § 1595(a). *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 181 (E.D. Pa. 2020).  A plaintiff may satisfy these elements in one of two ways.  She may show that the defendant's own acts, omissions, and state of mind establish each element.  Alternatively, she may impute to the defendant the acts, omissions, and state of mind of an agent of the defendant.  The former is referred to as "direct liability" and the latter as "indirect liability."  *See, e.g.*, *A.B. v. Hilton Worldwide Holdings, Inc.*, 2020 WL 5371459, at *6 (D. Ore. Sept. 8, 2020); *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *4 (N.D. Cal. July 30, 2020).  Plaintiff asserts her TVPRA claims under both direct liability and indirect liability theories.

## IV.  ANALYSIS

### A.  Wyndham

Wyndham moves to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Docket No. 69 at 1.  Wyndham insists that plaintiff's reading of TVPRA is incorrect, that Wyndham had no affiliation with the La Quinta hotel brand or facility

when plaintiff was allegedly trafficked,[3] and that plaintiff has failed to state a claim

against Wyndham because plaintiff has not plausibly pled any of the three elements

mentioned above. *Id.* at 5, 9, 10.

### 1. Direct Liability

#### a. Whether Wyndham Knowingly Benefited

Wyndham insists that not all benefits are sufficient to establish the "knowingly

benefit" element of the TVPRA. *Id.* at 9. Liability, Wyndham argues, requires that the

defendant knowingly benefit "from" its participation in a venture that commits trafficking

crimes. *Id.* (emphasis omitted). Wyndham explains that there must be "'a causal

relationship between affirmative conduct furthering the sex-trafficking venture and

receipt of a benefit,' with knowledge of that causal relationship." *Id.* (quoting *Geiss v.*

*Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019)). Wyndham

claims that it could not have benefited because it was not affiliated with La Quinta and

because the hotel "benefited, if at all, from the rental of hotel rooms to the public

generally – not from Plaintiff's alleged trafficker." *Id.* at 10. The mere rental of a room,

Wyndham argues, is insufficient to show this element of the TVPRA.

Plaintiff disagrees with Wyndham's theory of beneficiary liability. Plaintiff's

theory is that because Wyndham received a percentage of room revenue generated by

La Quinta, including from the room that plaintiff's trafficker rented, it benefited from the

trafficking. Docket No. 75 at 6–7. Further, plaintiff insists that receipt of money "from"

---

[3] While Wyndham insists in its response that it had no affiliation with La Quinta in 2016, when plaintiff was allegedly trafficked at the hotel, *see id.* at 2, Wyndham "set[s] aside th[is] fact" and moves for dismissal on the merits of plaintiff's TVPRA claim. *Id.* The Court therefore considers the merits of Wyndham's arguments.

the conduct is not necessary under § 1595, though it may be under the criminal provisions of the TVPRA. *Id.* at 7 (citing *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112, 1137 (2019)).

Several other district courts have found that similar allegations are sufficient to plead the knowingly benefited element. *See, e.g.*, *E.S. v. Best W. Int'l, Inc.*, 2021 WL 37457, at *3 (N.D. Tex. Jan. 4, 2021); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 965 (S.D. Ohio 2019) ("[T]he rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the [§] 1595(a) standard."); *A.B.*, 455 F. Supp. 3d at 191 (same); *H.H. v. G6 Hosp., LLC*, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019) (same); *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1256 (M.D. Fla. 2020) (same); *A.B.*, 2020 WL 5371459, at *7 ("The 'knowingly benefits financially' element of § 1595 merely requires that Defendant knowingly receive a financial benefit[,] and the rental of a hotel room . . . constitutes a financial benefit sufficient to meet this element." (internal quotations omitted)). The Court agrees with these cases and finds that plaintiff has sufficiently alleged the knowingly benefited element under her direct liability theory against Wyndham.

### b. Whether Wyndham Participated in a Venture that it Knew or Should Have Known Engaged in Sex Trafficking

Wyndham states that it did not "'participat[e] in a venture' that committed sex-trafficking crimes against the plaintiff." Docket No. 69 at 5 (quoting § 1595(a)). "Venture," Wyndham explains, is defined as "any group of two or more individuals associated in fact, whether or not a legal entity." *Id.* (quoting § 1595(e)(6)). Wyndham states that the TVPRA's definition of "venture" tracks the definition of "enterprise" in the

Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961(4), and that a RICO enterprise requires the entities to operate as a "continuing unit that functions with a common purpose." *Id.* (quoting *Boyle v. United States*, 556 U.S. 938, 948 (2009)).  Wyndham claims that two entities engaging in a commercial transaction, like renting a hotel room, does not give rise to "a reasonable inference that the participants in such a transaction shared any common purpose, operated as a continuing unit, or otherwise 'associated in fact.'" *Id.* at 6.  Furthermore, Wyndham argues that "participation" requires an "overt act" in furtherance of the venture, but lawful association with someone who commits a crime is insufficient. *Id.* at 6–8 (citing *Bistline v. Parker*, 918 F.3d 849, 874–75 (10th Cir. 2019) (overturning dismissal where the defendants, lawyers for the Mormon church, had engaged in a "scheme" that was "designed expressly for the purpose of facilitating" crimes by church leadership so that leadership would "personally reap ample benefits therefrom," despite "extensive knowledge [that church leaders were] using power to harm plaintiffs"); *Ricchio v. McLean*, 853 F.3d 553, 555–56 (1st Cir. 2017) (holding that hotel owners and sex traffickers engaged in a "venture" because the hotel owners knowingly rented rooms to the trafficker "for the purpose" of trafficking the plaintiff.)).  Because plaintiff has made no such allegations against Wyndham, the company believes that plaintiff has failed to plausibly allege that Wyndham participated in a "venture" under the TVPRA.

Plaintiff explains that Wyndham is mistaken in asking the Court to interpret "participation in a venture" as requiring an overt act.  Docket No. 75 at 8.  Rather, the notice provision of the TVPRA allows "constructive knowledge as to what Wyndham

'should have known.'"  *Id.*  Plaintiff also explains that some courts have held that a defendant need not commit an overt act or have actual knowledge, while other courts "incorrectly interpret and apply a criminal standard."  *Id.* at 8–9.  The courts that have held that no overt act is necessary have explained that the definition of "participation in a venture" found in § 1591(e)(4) – "knowingly assisting, supporting or facilitating a violation" – only applies to criminal violations, not civil actions brought under § 1595.  *Id.* at 9 (citing *A.B.*, 455 F. Supp. 3d at 188 ("If we imputed [§ 1591's] standard into section 1595 – which does not define 'participation in a venture' – we would ignore [§ 1595's] 'knew or should have known' language.")).  Plaintiff also explains that courts in this district have refused to apply the definition of "venture" under the criminal provision of the TVRA to a civil claim.  *Id.* at 10 (citing *Gilbert*, 423 F. Supp. 3d at 1138).

The Court agrees with plaintiff that an "overt act" is not required under the TVPRA.  In fact, most district courts to have examined the issue have rejected the overt act argument.  *See, e.g.*, *E.S.*, 2021 WL 37457, at *4; *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 968–69; *J.C. v. Choice Hotels Int'l, Inc.*, 2020 WL 3035794, at *1 n. 1 (N.D. Cal. June 5, 2020); *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 153–54 (E.D.N.Y. 2020); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, 2020 WL 1244192, *6 (S.D. Ohio Mar. 16, 2020).  Those courts reasoned that "applying the definition of 'participation in a venture' provided for in § 1591[] to the requirements under § 1595 would void the 'known or should have known' language of § 1595," and violating the "cardinal principle of statutory construction that a statute ought, upon the whole, to be construed so that, if it can be prevented, no clause, sentence, or word

shall be superfluous, void, or insignificant." *M.A.*, 425 F. Supp 3d at 969 (internal quotation and citation omitted).  The Court agrees with this statutory analysis and concludes that plaintiff is not required to establish an overt act in furtherance of or actual participation in sex trafficking under § 1595.

The Court next considers whether plaintiff has plausibly alleged that Wyndham participated in a venture which it knew or should have known engaged in sex trafficking. Plaintiff asserts that Wyndham, not the La Quinta in the Tech Center, "actively participated in this illegal endeavor by knowingly or negligently providing lodging to [plaintiff's] trafficker in which to harbor [plaintiff] while he was trafficking her."  Docket No. 75 at 10 (quoting Docket No. 65 at 50, ¶ 134).  She further states that "[d]efendants . . . knowingly or negligently aided and participated with [plaintiff's] trafficker in his criminal venture" by renting him a room, Docket No. 65 at 50, ¶ 134, and by failing to act as plaintiff "repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment, and often displaying prominent bruising all over her person."  *Id.* at 50–51, ¶ 135.

Wyndham argues that allegations that it knew or should have known of commercial sex activity at the La Quinta in the Tech Center are insufficient and that plaintiff's other allegations, principally of a noise complaint, are "boilerplate" and "conclusory," and therefore insufficient to withstand a motion to dismiss because the allegations cannot support an inference that hotel staff should have known that plaintiff was being trafficked.  Docket No. 69 at 11.  Further, Wyndham states that allegations about what the housekeeping staff would have seen are "speculative."  *Id.* at 12.

Plaintiff explains that the standard is negligence for civil defendants and that

Wyndham's description of the standard asks plaintiff to prove more than she needs to under the civil action sections of the TVPRA.  Docket No. 75 at 10–11.  Plaintiff also explains that courts have found that failure to implement policies sufficient to combat a known problem can amount to negligence.  *Id.* at 11 (citing *M.A.*, 425 F. Supp. 3d at 965).  Plaintiff points to the complaint's allegations of "obvious signs of sex trafficking" that properly trained staff would have noticed and reported, including her trafficker paying for the room in cash nightly for a "couple of weeks," plaintiff's appearance at check-in wearing days-old clothing, visibly withdrawn, and with three older men, greeting frequent buyers in the lobby, the constant and voluminous foot traffic to her room, refusal of maid service, used condoms in the room, a noise complaint, and that Wyndham's "limitation on electronic devices" would have shown staff that her traffickers were accessing Backpage.com from within the hotel.  *Id.* (citing Docket No. 65 at 47–48, ¶¶ 117–121).

In reply, Wyndham states that plaintiff has failed to show that Wyndham "subjectively believed there was a high probability that Plaintiff was being trafficked and took deliberate steps to avoid confirming such conduct."  Docket No. 84 at 6; *see also S.J.*, 473 F. Supp. 3d at 154 ("The real issue is . . . whether a defendant satisfies the knowledge element as to a particular sex trafficking venture.").

In determining whether plaintiff's allegations – that Wyndham participated in a venture which it knew or should have known engaged in sex trafficking – are sufficient, the Court considers the two cases that represent the ends of the spectrum on TVPRA civil liability, *Ricchio*, mentioned above, and *Lawson v. Rubin*, 2018 WL 2012869

17

(E.D.N.Y. Apr. 29, 2018).  In *Ricchio*, along with the allegations of "high-fives" between the trafficker and hotel owner while discussing "getting this thing [a past business relationship between the trafficker and hotel owner] going again," the plaintiff alleged that "in plain daylight view of the front office of the motel," her trafficker "kick[ed] her and force[d] her back toward the rented quarters when she had tried to escape." *Ricchio*, 853 F.3d at 555.  Plaintiff's allegations in this case do not rise to the level of obviousness in *Ricchio*.  She does not allege a direct agreement between the trafficker and hotel staff or that particular hotel staff members saw her in a deteriorated state.

In *Lawson*, which Wyndham relies on, plaintiffs sued Blue Icarus, the owner of a condo leased to a sex trafficker, Howard Rubin.  Rubin procured women who he then sexually assaulted and abused.  *Lawson*, 2018 WL 2012869, at *13.  The court found the plaintiff's allegations insufficient to hold Blue Icarus liable under § 1595 because Blue Icarus did not have reason to know about the trafficking.  *Id.* ("Plaintiffs did not claim that Blue Icarus had actual notice of the alleged activity, only that it should have known about alleged trafficking based on its duty to monitor the premises.").

Plaintiff's allegations lie somewhere between those in *Ricchio* and those in *Lawson*.  In fact, the allegations are quite similar to those in *M.A.*, 425 F. Supp. 3d at 967 (the trafficker refused housekeeping services, paid in cash, and escorted the plaintiff in view of the front desk; hotel staff ignored the plaintiff's cries; plaintiff's buyers would enter and exit the hotel through the front door).  The *M.A.* court held that these allegations were insufficient to establish actual knowledge because the plaintiff did not allege that any member of the hotel staff heard and ignored her pleas or that she

alerted any staff member to her need for help. *Id.* at 968. Plaintiff in this case has similarly failed to show actual knowledge of her trafficking.

Further, even when construed in the light most favorable to plaintiff, her allegations do not plausibly establish that Wyndham, the parent company or franchisor, should have known about plaintiff's sex trafficking at one of its hotels, even if Wyndham controlled the La Quinta in the Tech Center in 2016. *See A.B.*, 2020 WL 5371459, at *9. Plaintiff alleges that Wyndham was on notice about the prevalence of sex trafficking generally at its hotels. Docket No. 65 at 38–39, ¶ 103.j. But this is not sufficient to show that Wyndham should have known about what happened to this plaintiff. *S.J.*, 2020 WL 4059569, *5 (noting that § 1595 "speaks in singular terms – 'participation in *a* venture which that person . . . should have known *has* engaged in *an* act in violation of this chapter'" means knowledge of a general sex trafficking problem is not sufficient and thus finding that hotel franchisor defendants could not be held directly liable under TVPRA). General knowledge of commercial sex activity occurring at hotels across the United States is insufficient on its own to demonstrate that Wyndham participated in the trafficking of plaintiff. *See A.B.*, 2020 WL 5371459, at *9.

Thus, the complaint fails to allege facts as to how Wyndham, the parent company or franchisor, was aware or should have been aware of these facts. *A.B.*, 2020 WL 5371459, at *9. Accordingly, plaintiff has not alleged facts sufficient to state a claim for direct liability under the TVPRA against defendant Wyndham.

### 2. *Indirect Liability*

Plaintiff alleges that Wyndham has an actual or apparent agency relationship

with the La Quinta hotel where plaintiff was allegedly trafficked. Docket No. 65 at

34–35, ¶¶ 103.f–g. Wyndham, however, insists – in reply only – that TVPRA does not

provide for "secondary" liability and that, as explained and as plaintiff concedes,

Wyndham had no affiliation with the La Quinta brand at the time of the alleged

trafficking. Docket No. 84 at 8. While the TVPRA is silent on the issue of indirect

liability, numerous district courts have rejected the argument that the TVPRA does not

permit agency liability. *See, e.g.*, *J.C. v. Choice Hotels Int'l, Inc.*, 2020 WL 6318707, at

*8 (N.D. Cal. Oct. 28, 2020); *B.M.*, 2020 WL 4368214, at *7; *M.A.*, 425 F. Supp. 3d at

972. Because the TVPRA is silent, courts have held that the federal common law of

agency should apply. *J.C.*, 2020 WL 6318707, at *8. Tenth Circuit courts apply

common law agency principles from the Restatement (Third) of Agency. *United States*

*v. Speakman*, 594 F.3d 1165, 1173 (10th Cir. 2010) ("employers are generally held

liable on that theory not because of any act or omission on their part, but rather

because the employee was acting within the scope of his duty" (citing Restatement

(Third) Agency § 7.07)). To state a claim for vicarious liability under an agency theory,

a plaintiff must plausibly allege that (1) defendants and their corresponding hotels were

in an agency relationship, and (2) the hotels or hotel staff are plausibly liable under

§ 1595. *A.B.*, 2020 WL 5371459, at *9.

　　　Plaintiff alleges that franchisee–franchisor relationships are sufficient to create

an agency relationship if the franchisor exercises sufficient control over the operations

of the franchisee. Docket No. 75 at 13 (citing *Licari v. Best W., Int'l Inc.*, 2013 WL

3716523 (D. Utah July 12, 2013)). She also alleges that Wyndham was in an actual or

apparent agency relationship with the La Quinta hotel where plaintiff was trafficked, Docket No. 65 at 35–36, ¶¶ 103.f–g, and that Wyndham exercises ongoing, systemic control over Wyndham-brand hotels "memorialized in the franchise agreements Wyndham executed with its franchisee subsidiaries and Wyndham brand operating hotels."  Docket No. 75 at 14.  Plaintiff also alleges that Wyndham exercises daily control over its hotels.  Docket No. 65 at ¶ 103.g.

Although Wyndham disputes these allegations, the Court accepts the factual allegations of the complaint as true and draws all reasonable inferences in favor of the non-moving party at this stage.  *Colbruno v. Kessler*, 928 F.3d 1155, 1160 (10th Cir. 2019).  The Court finds these allegations sufficient to show an actual agency relationship between Wyndham and La Quinta.  *A.B.*, 2020 WL 5371459, at *10 (finding similar allegations sufficient to plead an agency relationship where plaintiff alleged facts to support her theory that defendants had authority to control aspects of the hotel operations connected to her claim, including "hosting online bookings," "making employment decisions," and "controlling training and policies"; dismissing indirect liability claim on other grounds); *S.Y.*, 476 F. Supp. 3d at 1258 ("Plaintiffs correctly respond that they do not need to prove an agency relationship at this stage, but simply set forth plausible allegations that one exists.  Having reviewed the allegations at issue, the Court finds them sufficient to satisfy the motion to dismiss standard." (citation omitted)).  The allegations, however, are insufficient to show that Wyndham exercised this control in 2016, as both plaintiff and Wyndham appear to agree that Wyndham did not affiliate with La Quinta until 2018, two years after plaintiff was trafficked at the La Quinta hotel.

21

While Wyndham does not raise this argument in its motion, plaintiff insists that Wyndham is indirectly liable on a theory of apparent agency.  Docket No. 75 at 14.  To establish such liability, plaintiff would have to show that manifestations by Wyndham led her to believe that La Quinta was an agent of Wyndham and that she relied on that belief.  Restatement (Third) of Agency § 2.03 (2006).  *See also id.* at § 2.03 cmt. c. ("Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal.").  Plaintiff alleges that Wyndham held out La Quinta to the public as "its direct alter-ego[,] each possessing authority to act on the other's behalf."  Docket No. 65 at 37, ¶ 103.h.  But plaintiff has not alleged that she relied on any representation by Wyndham or La Quinta when she was trafficked at the Tech Center La Quinta.  Therefore, an apparent agency theory of liability does not comport with the underlying facts of this case.  *A.B.*, 2020 WL 5371459, at *12.  The Court therefore finds that plaintiff has failed to allege the elements of apparent authority.

### B.  Marriott

Marriott seeks to dismiss plaintiff's complaint, which alleges that Marriott "owns, controls, supervises or operates" the Sheraton at the Denver Tech Center, Docket No. 65 at 40, ¶ 104.a, for three reasons.  Docket No. 70.  First, Marriott argues that plaintiff has failed to plead sufficient facts to establish that Marriott knowingly benefited from or participated in the alleged trafficking, or that Marriott knew or should have known that plaintiff was trafficked.  *Id.* at 1.  Marriott explains that the complaint contains only part

of a single sentence of allegations regarding what happened to plaintiff at the Sheraton hotel and that the rest of the allegations in the same paragraph refer to the Best Western hotel.  *Id.* at 2.  Second, Marriott claims that the complaint lacks allegations that Marriott knew or could have known that plaintiff was being trafficked at the Sheraton because there are no allegations that establish that anything that occurred at the Sheraton would have put Marriott on notice of plaintiff's trafficking.  *Id.* at 2–3. Third, Marriott argues that the complaint fails to establish Marriott's vicarious liability of the staff at the local Sheraton hotel, which Marriott explains is a franchise property that was independently owned and operated by non-defendants.  *Id.* at 3.[4]

### 1.  Direct Liability

### a.  Whether Marriott Knowingly Benefited

Marriott argues, as Wyndham did, that it did not knowingly benefit from the sex trafficking of plaintiff at the Sheraton hotel because plaintiff's allegations that Marriott received payment for rooms that plaintiff was kept in are insufficient where Marriott had no reason to suspect that sex trafficking crimes were being committed.  Docket No. 70 at 7.  Further, the "mere collection of rent by an unrelated hotel manager from guests in the ordinary course of business cannot support a reasonable inference" that Marriott knowingly benefited.  *Id.* at 7–8.  For the reasons stated above, in the Court's analysis of Wyndham's similar argument, the Court finds that plaintiff has adequately alleged the

---

[4] Marriott raises additional arguments that plaintiff has "merely copied and pasted 'cookie-cutter' or boiler-plate allegations from the pleadings of other, unrelated TVPRA litigants, filed in different states around the same date, as part of a failed effort to consolidate claims against the hotel industry generally."  *Id.* at 11.  Because the Court finds that plaintiff has failed to state a claim against Marriott, the Court does not reach these allegations.

"knowingly benefited" element of her claim.  *See* Part IV.A.1.a.

### b.  Whether Marriott Participated in a Joint Venture that it Knew or Should Have Known Engaged in Sex Trafficking

Marriott argues that the complaint fails to sufficiently allege that Marriott participated in a sex trafficking venture with the traffickers.  *Id.* at 8.  Marriott insists that it had none of the three types of knowledge that a court recently found necessary to establish this element.  *Id.* (citing *Jane Doe 2 v. Red Roof Inns, Inc.*, 2020 WL 1872337, at *3 (N.D. Ga. Apr. 13, 2020) (holding defendants must have knowledge as to the benefit derived from trafficking, knowledge as to assisting or facilitating trafficking, and knowledge that plaintiff was either a minor or subject to force)).  Marriott also argues, as Wyndham did, that "venture" requires common purpose among participants, i.e., between the hotel and the traffickers.  *Id.* at 9–10.  In addition, Marriott relies on similar RICO arguments that the Court found unpersuasive with regard to Wyndham. *Id.* at 10–11.

Plaintiff's response to Marriott is almost verbatim to her response to Wyndham. Docket No. 73.  The Court similarly finds plaintiff's direct liability theory against Marriott is insufficiently pled as to this element.  As with Wyndham, plaintiff has not established that Marriott, the parent company or franchisor, participated in a venture which it knew or should have known engaged in sex trafficking because plaintiff's allegations are insufficient to establish either actual knowledge or that Marriott should have known about plaintiff's trafficking at the Tech Center Sheraton.  Plaintiff's allegations with respect to Marriott are even less specific as to the issue of Marriott's direct liability than are her allegations against Wyndham.  She provides no facts that, under her theory,

24

could have alerted Marriott to her trafficking.  For example, she makes no allegations about the state of the room, how she looked when she arrived at check-in, the number of buyers front desk staff may have seen enter her room, whether she spoke to a staff member, or whether her pleas resulted in any noise complaints that could have put hotel staff on notice.  As Marriott notes, plaintiff does not even allege that she engaged in commercial sex activity at the Tech Center Sheraton.  Docket No. 70 at 7.  While plaintiff responds that she has provided "a sufficient number of signs [that] would have alerted a diligent hotel brand to her plight if hotel staff had been properly trained," Docket No. 73 at 10, the Court can find no such signs in plaintiff's complaint.  The single paragraph that mentions the Sheraton hotel states only that plaintiff "arrived at the Sheraton with three (3) much older men."  Docket No. 65 at 49, ¶ 125.  The rest of the paragraph recites events that allegedly took place at the Best Western.  *Id.*  Finally, as with Wyndham, plaintiff alleges that Marriott was on notice about sex trafficking generally at its Sheraton hotels, *id.* at 43–45, ¶ 104, but, as the Court has explained, this is not sufficient to show that Marriott should have known about what happened to this plaintiff.  *See S.J.*, 2020 WL 4059569, *5; *A.B.*, 2020 WL 5371459, at *9.

Thus, the Court finds that these allegations are insufficient to plausibly allege that Marriott participated in a joint venture with plaintiff's traffickers that it knew or should have known engaged in trafficking.  *See A.B.*, 2020 WL 5371459, at *9.  Accordingly, plaintiff has not alleged facts sufficient to state a plausible claim for direct liability under the TVPRA against defendant Marriott.

### 2. *Indirect Liability*

Marriott argues that plaintiff's complaint "alleges, in a conclusory manner and without support, that the franchise relationship with the Sheraton hotel renders Marriott International vicariously liable for [plaintiff's] alleged trafficking based on actual or apparent agency theory." Docket No 70 at 12. Rather, Marriott states that civil liability under the TVPRA extends only to those who "knowingly benefit from participation in ventures with the criminals," not "to franchisors based on the alleged participation in the franchisee." *Id.* Even if secondary liability were available under the TVPRA,[5] Marriott continues, the complaint fails to state a claim because it does not establish that Marriott exercised any control over "the particular instrumentality of the harm to Plaintiff." *Id.* at 13.

Plaintiff alleged that Marriott exercised substantial control over the Sheraton hotel by, among other things, "hosting online bookings on Defendant Marriotts's [sic] domain; requiring Sheraton hotels to use Defendant Marriott rewards program(s); setting parameters on employee wages; . . . making employment management decisions; . . . building and maintaining the facility in a manner specified by Marriott, including changes and/or modifications to the structure, guest rooms and/or restaurants and shops within the property; hours of operation for restaurants and shops within the property." Docket No. 65 at 42, ¶ 104.g.i–xi. Marriott disputes these allegations and insists that liability based on a franchise relationship requires control over managing the

---

[5] As noted earlier, while the TVPRA is silent on the issue of indirect liability, numerous district courts have rejected the argument that the TVPRA does not permit such liability.

day-to-day operations of a hotel but that Marriott did not have such control over the Sheraton hotel.  On a motion to dismiss, however, the Court assumes the allegations in plaintiff's complaint are true.  *Colbruno*, 928 F.3d at 1160.  These allegations, if proven, would show control over the day-to-day operations of the Tech Center Sheraton hotel sufficient even under Marriott's agency theory.

Nevertheless, as the Court found in regard to Wyndham, plaintiff fails to state a claim under an agency theory because the complaint does not plausibly allege that Marriott is liable under § 1595.  *A.B.*, 2020 WL 5371459, at *11.  The deficiencies in the complaint are readily discernable when compared to cases where courts have concluded that plaintiffs sufficiently alleged hotels knew or should have known of a plaintiff's trafficking.  For instance, plaintiff does not contend that hotel staff observed her trafficker forcefully bring her to a hotel, restrain her, or argue with her.  *See A.B.*, 455 F. Supp. 3d at 189–90 (alleging staff were aware of "loud altercations" as well as "constant" attacks on the plaintiff); *H.H.*, 2019 WL 6682152, at *1 (claiming hotel staff discovered her chained up in the bathroom and ignored her plea for help).  Plaintiff only alleges that she arrived at the Sheraton with three "much older men."  Docket No. 65 at 49, ¶ 125.  This is insufficient to establish an actual agency claim under the TVPRA.

Marriott also argues that plaintiff fails to allege facts to support an apparent agency theory.  As explained above, to establish liability based on apparent agency, plaintiff had to show that manifestations by the principal – here, Marriott – led her to believe that Sheraton was an agent of Marriott's and that she relied on that belief.  Restatement (Third) of Agency § 2.03.  As with Wyndham, plaintiff alleges in the complaint that Marriott held out Sheraton as possessing authority to act on Marriott's

behalf.  Docket No. 65 at 43, ¶ 104.h.  But plaintiff has not alleged that she relied on

any representation by Marriott when she was allegedly trafficked at the Tech Center

Sheraton.  *A.B.*, 2020 WL 5371459, at *12.  She has therefore failed to allege the

elements of apparent authority.

### C.  Best Western

Best Western seeks dismissal on multiple grounds.  Docket No. 71.  It argues

that it does not own the hotel where plaintiff alleges that she was trafficked and that

publicly available documents refute plaintiff's arguments to the contrary.  *Id.* at 2.  It also

argues that the Court lacks personal jurisdiction over the company, that plaintiff's

"shotgun pleading" is improper, that plaintiff provides no details specific to her trafficking

at the hotel, and that plaintiff has failed to provide facts that Best Western knowingly

benefited from participation in a sex trafficking venture.  *Id.*  Finally, Best Western

argues that plaintiff's theories of vicarious liability and agency are contrary to the facts

and the law and that the agreement between Best Western and the hotel show that

Best Western does not handle day-to-day operation of the hotel.  *Id.*

### 1.  Personal Jurisdiction

Best Western insists that it does not own the hotel identified in plaintiff's

complaint, the Best Western Plus, Docket No. 65 at 3, ¶ 9, and that the current owner

has owned the premises since April 17, 2015, which predates plaintiff's alleged 2016

trafficking.  Docket No. 71 at 3.[6]  Best Western argues that plaintiff's conclusory

---

[6] Plaintiff's response does not contest this point explicitly.  Rather, she refutes Best Western's personal jurisdiction arguments and its substantive TVPRA arguments. *See* Docket No. 77.

allegations – for example that defendants' "misconduct and omissions occurred in the judicial district where this action is brought," Docket No. 65 at 11–12, ¶ 27, or that defendants have purposefully availed themselves of the privilege of conducting acts in Colorado," *id.* at 12, ¶¶ 28–29 – are insufficient to confer personal jurisdiction.  Docket No. 71 at 3–4.  As mentioned previously, dismissal under Federal Rule of Civil Procedure 12(b)(2) is proper where a defendant does not have the necessary "minimum contacts" with the forum state, *see Int'l Shoe*, 326 U.S. at 316, because the defendant does not maintain continuous and systematic business in the state, *OMI Holdings*, 149 F.3d at 1091, or has not purposefully directed its activities at residents of the forum state.  *Soma Med.*, 196 F.3d at 1298.

### a. General Jurisdiction

General jurisdiction requires that a defendant have contacts with the forum "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *see also Trujillo v. Williams*, 465 F.3d 1210, 1218 n.7 (10th Cir. 2006).  For corporations, the rule is the same.  "The 'paradigm' forums in which a corporate defendant is 'at home,' . . . are the corporation's place of incorporation and its principal place of business." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017).  While the Supreme Court has stated that general jurisdiction is not limited to these two places, other places are said to be "exceptional" because they are appropriate only when the corporate defendant's operation in the forum state is so "substantial and of such a nature as to render the corporation at home" in the forum state.  *Id.* (citations omitted).  The Court in

*BNSF* provided an example.  The Supreme Court "forced [a] defendant corporation's owner to temporarily relocate the enterprise from the Philippines to Ohio," which "became 'the center of the corporation's wartime activities'" and as such "suit was proper there."  *Id.* (quoting *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447–48 (1952)).

Best Western insists that it is not "at home" in Colorado because it is neither incorporated nor has its principal place of business here.  Docket No. 71 at 4.  Plaintiff does not dispute this.  Rather, citing Best Western's website, plaintiff says that Best Western owns, operates, or controls 36 hotels in Colorado and receives revenue from each location.  Docket No. 77 at 4.  Plaintiff believes these ongoing, contractual relationships amount to Best Western being "at home" in Colorado.  *Id.*  Plaintiff is mistaken, however.  Plaintiff acknowledges that she bears the burden of proof on this issue, *id.* at 3 (citing *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995)), yet fails to explain how Best Western's activity in Colorado is any greater than its activity is in any other state where there are Best Western hotels such that it would fit into the *BNSF* Court's notion of "exceptional."  *See BNSF*, 137 S. Ct. at 1558.  The Court finds that Best Western is not "at home" in Colorado and that the Court lacks general jurisdiction over the defendant.

### b.  Specific Jurisdiction

 Specific jurisdiction is present only if the lawsuit "aris[es] out of or relat[es] to the defendant's contacts with the forum."  *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017).  The specific jurisdiction analysis is two-fold.  First, the

Court must determine whether defendant has such minimum contacts with Colorado that defendant "should reasonably anticipate being haled into court" here. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Within this inquiry, the Court must determine whether defendant purposefully directed its activities at residents of the forum, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985), and whether plaintiff's claims arise out of or results from "actions by . . . defendant . . . that create a substantial connection with the forum State." *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 109 (1987) (internal quotations omitted). Second, if defendant's actions create sufficient minimum contacts, the Court must consider whether the exercise of personal jurisdiction offends "traditional notions of fair play and substantial justice." *Id*. at 113. This inquiry requires a determination of whether the Court's exercise of personal jurisdiction over defendant is "reasonable" in light of the circumstances of the case. *Id*. The mere quantum of contacts between the forum and defendant is not determinative. *Far W. Capital*, 46 F.3d at 1077. Instead, the analysis should focus on the quality of the contacts, their significance to the venture, and the overall purpose of the parties' efforts. *Id*. "[P]arties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473.

Colorado's long-arm statute provides for personal jurisdiction over defendants who commit "tortious acts within this state." Colo. Rev. Stat. § 13-1-124(1)(b); *see also Nat'l Bus. Brokers, Ltd. v. Jim Williamson Prods., Inc.*, 115 F. Supp. 2d 1250, 1255 (D.

31

Colo. 2000).  In interpreting the long-arm statute, the Colorado Supreme Court has held that "it is not necessary that both the tortious conduct constituting the cause and the injury constituting the effect take place in Colorado.  Instead, . . . the statute [may be] satisfied when only the resulting injury occurs in the state."  *Classic Auto Sales, Inc. v. Schocket*, 832 P.2d 233, 235–36 (Colo. 1992).  Accordingly, "[a]llegations that a defendant's acts in another state ultimately caused injury in Colorado, and thus constituted a tort here, suffice as a prima facie showing of threshold jurisdiction." *Jenner & Block v. Dist. Ct.*, 590 P.2d 964, 965–66 (Colo. 1979).

Best Western states that it is a "cooperative association" with "no Colorado offices or corporate presence, and thus does not purposefully avail itself of everyday business in the state."  Docket No. 71 at 5.  Because Best Western's "principal place of business is in Arizona," the company argues that it is "unreasonable to hale [Best Western] into court in Colorado."  *Id.*  Plaintiff insists that Best Western's activity in Colorado – 36 locations that produce revenue for the company – as well as the facts that plaintiff has alleged regarding her trafficking at the Best Western hotel are sufficient to confer specific jurisdiction over the company.  Docket No. 77 at 5–6.  As the Court assumes these facts to be true at this stage of the litigation, the Court finds that plaintiff has met her burden of making a prima facie showing of personal jurisdiction with respect to Best Western.  Best Western's allegedly tortious conduct and the attendant injuries that plaintiff allegedly suffered both occurred in Colorado, satisfying Colorado's long-arm statute.  Furthermore, by operating 36 hotels in the state, Best Western should reasonably anticipate being haled into court here.  Given Best Western's not insignificant business dealings in Colorado, the Court finds that exercising jurisdiction

32

over the company would not offend "traditional notions of fair play and substantial justice." *Asahi*, 480 U.S. at 113.

### 2. Direct Liability

#### a. Whether Best Western Knowingly Benefited

Best Western argues that plaintiff cannot make out a claim that Best Western knowingly benefited from plaintiff's trafficking because "liability under Section 1595(a) requires a finding that the benefit derived directly from the defendant's participation in a sex-trafficking venture." Docket No. 71 at 11. At most, Best Western argues, plaintiff has established that Best Western "received royalties through its contractual relationship with the owner of the Best Western branded hotel identified." *Id.* This is not sufficient to impose liability on Best Western, the company argues. *Id.* For support, Best Western relies on *Ricchio* and *Lawson*, discussed above. *Id.* at 12.

As the Court held with respect to Wyndham and Marriott, *see, e.g.*, Part IV.A.1.a, plaintiff's allegations are sufficient to plausibly establish the knowingly-benefited element of plaintiff's claim. Other courts across the country have held similarly. *See, e.g.*, *E.S.*, 2021 WL 37457, at *3; *M.A.*, 425 F. Supp. 3d at 965 ("[T]he rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the [§] 1595(a) standard."). The Court finds that plaintiff has plausibly pled this element of her claim with respect to Best Western.

#### b. Whether Best Western Participated in a Joint Venture that it Knew or Should Have Known Engaged in Sex Trafficking

Best Western argues that to make out a plausible § 1595 claim, a plaintiff must show that the defendant engaged in some "overt act to further the alleged trafficking."

33

Docket No. 71 at 13.  This is not correct, as the Court has already explained, because "applying the definition of 'participation in a venture provided for in § 1591[] to the requirements under § 1595 would void the 'known or should have known language of § 1595." *M.A.*, 425 F. Supp 3d at 969.  *See also E.S.*, 2021 WL 37457, at *4.  Best Western also argues that it could not reasonably have known of plaintiff's trafficking. Docket No. 71 at 14.

Nevertheless, plaintiff asserts that Best Western "actively participated in this illegal endeavor by knowingly or negligently providing lodging to [plaintiff's] trafficker in which to harbor [plaintiff] while he was trafficking her" and that Best Western "knowingly or negligently aided and participated with [plaintiff's] trafficker in his criminal venture" by taking no action when plaintiff "repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment, and often displaying prominent bruising all over her person" and by "knowingly or negligently providing lodging to those who purchased sex from [plaintiff] in which to harbor [plaintiff] while she was being trafficked."  Docket No. 65 at 50–51, ¶¶ 134–36. Plaintiff also explains that, at the Best Western in the Tech Center, she was injured so badly and screamed so loudly after a buyer sexually and physically assaulted her by slamming her head so hard against a dresser that the dresser was damaged and that the trafficker decided to move her to a different hotel.  *Id.*  at 47, ¶ 112.  She also states that at least six buyers per day would arrive at the front entrance of the hotel and would be escorted upstairs and then would leave through the front entrance, that she arrived at the hotel with no luggage and did not leave for five days, in the same clothes as when she arrive and visibly injured, and that there was an "astounding number of used

condoms scattered about and a broken dresser with [her] blood on it." *Id.*, ¶¶ 113–15.

The complaint, however, fails to allege facts as to how Best Western International – the parent company or franchisor of this hotel – was aware of these facts. First, plaintiff's allegations are insufficient to establish actual knowledge because plaintiff does not allege that any member of the hotel staff heard and ignored her pleas or that she alerted any staff member to her need for help. *See A.B.*, 2020 WL 5371459, at *9. Second, even when construed in the light most favorable to plaintiff, her allegations do not plausibly establish that Best Western, the parent company or franchisor, should have known about plaintiff's sex trafficking at one of its hotels. As with Wyndham, plaintiff alleges that Best Western, the hotel's parent company, was on notice about the prevalence of sex trafficking generally at its hotels. Docket No. 65 at 28–30, ¶ 101.i. But this is not sufficient to establish that Best Western should have known about the trafficking of plaintiff herself. *S.J.*, 2020 WL 4059569, *5. Nor are the specific facts that plaintiff alleged about the Best Western hotel in the Tech Center, including the signs that she alleges should have alerted staff to her situation, sufficient to plausibly show that the hotel's parent company or franchisor knew or should have known that plaintiff was trafficked at one of its hotels. *A.B.*, 2020 WL 5371459, at *9. Accordingly, plaintiff has not alleged facts sufficient to state a claim for direct liability under the TVPRA against defendant Best Western.

### 3. Indirect Liability

Because Best Western insists that it has no ownership, control, or operation of the hotel where plaintiff alleges she was trafficked, it argues that plaintiff's indirect

liability arguments must also fail.  Docket No. 71 at 5–6.  Best Western states that the allegations only relate to the owner of the hotel where plaintiff alleges she was trafficked, not to Best Western itself, as the hotel owner was not Best Western's agent. *Id.* at 6.  Best Western cites its membership agreement with the local owner, which states, in part, that Best Western has "no control over or responsibility for any decision relating to or affecting the employment or suspension of any person employed at or providing services in connection with the hotel." *Id.* (alteration omitted).  Best Western further argues that when a franchisor does not have the right to control the premises, as here, no agency relationship exists between the franchisor and the franchisee, and thus the franchisor may not be held vicariously liable for civil claims. *Id.*

Plaintiff insists that Best Western does maintain day-to-day control over its member hotels, including by setting rules of operation, making employment decisions, training employees, setting hours of operation, setting employee wages, and hosting bookings on the Best Western domain.  Docket No. 65 at 26–27, ¶ 101.f.  While Best Western disputes these allegations, at the motion to dismiss stage, the Court accepts factual allegations of the complaint as true. *Colbruno*, 928 F.3d at 1160.  As such, the Court finds plaintiff's allegations sufficient to show an actual agency relationship between Best Western and the Best Western branded hotel where plaintiff was trafficked. *A.B.*, 2020 WL 5371459, at *10.

Nevertheless, as with Wyndham and Marriott, plaintiff fails to state a claim under an agency theory because the complaint does not plausibly allege that Best Western is liable under § 1595. *See id.*, at *11.  Plaintiff has failed to show that Best Western, the

parent company or franchisor, knew or should have known that plaintiff was trafficked at the particular Best Western hotel in the Denver Tech Center in 2016.  The deficiencies in plaintiff's complaint are even more stark when compared to cases where courts have found plaintiffs' allegations sufficient.  *A.B.*, 455 F. Supp. 3d at 189–90 (alleging staff were aware of "loud altercations" as well as "constant" attacks on the plaintiff); *H.H.*, 2019 WL 6682152, at *1 (claiming hotel staff discovered her chained up in the bathroom and ignored her plea for help).  While plaintiff alleges that she had a visible injury, appeared malnourished, received male guests, and that there were used condoms in the room, she does not allege that hotel staff noticed these to be signs of trafficking.

These allegations, even when taken as true and construed in plaintiff's favor, are not sufficient for the Court to conclude that Best Western had constructive knowledge of the trafficking of Plaintiff.  Plaintiff has, therefore, not stated a claim of actual agency under the TVPRA.  Plaintiff's apparent agency arguments fail for the reasons discussed above.  *See* Part IV.A.2.

### D.  Hyatt

Hyatt moves to dismiss plaintiff's complaint for multiple reasons.  Docket No. 72. First, Hyatt explains that, "[d]espite numerous requests by Hyatt for Plaintiff to name the proper Hyatt entity, Plaintiff again improperly named 'Hyatt Corporation' in her Amended Complaint.  Suit and service of process are thus insufficient."  *Id.* at 3. Second, Hyatt argues that the complaint is a "shotgun pleading" in violation of Rule 8(a) of the Federal Rules of Civil Procedure.  *Id.*  Third, Hyatt insists that plaintiff has failed

to state a TVPRA claim against Hyatt.  *Id.*

### 1.  Naming of Hyatt Corporation as a Defendant

Hyatt adopts the arguments in its original motion to dismiss, Docket No. 40 at 5–6.  Docket No. 72 at 7.  In its original motion, Hyatt argued that Hyatt Corporation is a "managing entity that has no involvement with the local Denver hotel, Hyatt Place Denver Tech Center, where the incidents allegedly occurred."  *Id.*  Hyatt states that under Rules 4(a)(1)(A) and (B) of the Federal Rules of Civil Procedure, "a proper summons must include, among other things, the correct names of the parties and must be directed to the correct defendant being sued."  *Id.* at 6 (citing Fed. R. Civ. P. 4(a)(1)(A), (B)).  Process is insufficient, Hyatt argues, if the summons and complaint provide a wrongly named party.  *Id.* (citing 5B Wright & Miller, Fed. Prac. & Proc. § 1353).  Hyatt argues that, because plaintiff has named the wrong party, her complaint should be dismissed under Rules 12(b)(4) and (5) of the Federal Rules of Civil Procedure.  *Id.*  In its motion to dismiss the amended complaint, Hyatt further states that the entity "implicated by Plaintiff's allegations – Select Hotels Group, LLC ("SHG") – still has not been served."  Docket No. 72 at 3 n.1.  Hyatt requests that the Court dismiss defendant Hyatt with prejudice and substitute SHG in the case caption.  *Id.* at 7.

Dismissal for insufficient service of process and insufficient process under Rule 12 of the Federal Rules of Civil Procedure is warranted where there is a showing of prejudice.  *OpenLCR.com, Inc. v. Rates Tech., Inc.*, 112 F. Supp. 2d 1223, 1230 (D. Colo. 2000); *see also* 4A Fed. Prac. & Proc. Civ. § 1088 (4th ed.) (Oct. 2020 update) (dismissal is generally unwarranted absent indication that "the error actually results in

defendant's prejudice or demonstrates a flagrant disregard of the requirements of [Rule 4]").  Hyatt has not claimed any prejudice here.

"A Rule 12(b)(4) motion constitutes an objection to the form of process or the content of the summons rather than the method of its delivery."  *Oltremari by McDaniel v. Kan. Soc. & Rehab. Serv.*, 871 F. Supp. 1331, 1349 (D. Kan. 1994) (citation omitted); *see United States v. Sharon Steel Corp.*, 681 F. Supp. 1492, 1499 n.14 (D. Utah 1987). When the moving party fails to object to the form of the process or the content of the summons, a motion under Rule 12(b)(4) is inappropriate.  5B Fed. Prac. & Proc. Civ. § 1353 (3d ed.).  A motion under Rule 12(b)(5) is the "proper vehicle for challenging the mode of delivery or the lack of delivery."  Fed. Prac. & Proc. Civ. § 1353; *see also Oltremari*, 871 F. Supp. at 1349 (citation omitted); *see Sharon Steel Corp.*, 681 F. Supp. at 1499 n. 14.  An appropriate objection under Rule 12(b)(5) would be the non-receipt by the defendant of a summons, the absence of an agency relationship between the recipient of the process and the defendant, or a lack of notice to the defendant.  *Id.*

In opposing a motion to dismiss for insufficient process or insufficient service of process, "plaintiff bears the burden of making a prima facie case that he has satisfied statutory and due process requirements so as to permit the court to exercise personal jurisdiction over the defendant."  *Allen v. United Props. & Const.*, No. 07-cv-00214-LTB-CBS, 2008 WL 4080035, at *9 (D. Colo. Sept. 3, 2008) (quoting *Fisher v. Lynch*, 531 F. Supp. 2d 1253, 1260 (D. Kan. 2008)).  Plaintiff must demonstrate that the procedure employed by him to effect service satisfied the requirements of Rule 4 of the Federal Rules of Civil Procedure.  *Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir. 1987).

While Hyatt is correct Rule 4(a)(1)(A) and (B) of the Federal Rules of Civil Procedure require that, for a summons to be proper, it must include the correct names of the parties and must be directed to the correct defendant, Docket No. 40 at 9, Hyatt does not argue that the summons was procedurally defective because its name was missing or because the name was a misnomer.[7]  Hyatt has also not alleged any prejudice or provided any affidavit that service was insufficient under Rule 4 of the Federal Rules of Civil Procedure.  Rather, Hyatt argues that plaintiff should have named SHG and not Hyatt, SHG's parent company.  *Id.*

Plaintiff, however, states that she intended to name Hyatt, not SHG, because she believes Hyatt Place is a brand of defendant Hyatt and that defendant Hyatt is responsible for the standards, including the human trafficking policies, that give rise to its direct liability under the TVPRA.  Docket No. 74 at 4.  Thus, plaintiff's naming Hyatt was not a misnomer or a mistake.  The Court finds that  plaintiff has made a prima facie showing that she has "satisfied statutory and due process requirements so as to permit the court to exercise personal jurisdiction over the defendant."  *Allen*, 2008 WL 4080035, at *9.

### 2.  Whether Plaintiff's Complaint is an Improper "Shotgun" Pleading

Hyatt next adopts the arguments in its original motion to dismiss that plaintiff's complaint is a "shotgun" pleading in violation of Rule 8 of the Federal Rules of Civil

---

[7] Hyatt would be on no better footing if it claimed misnomer.  "As a general rule the misnomer of a corporation in a notice, summons, . . . or other step in a judicial proceeding is immaterial if it appears that it could not have been, or was not, misled." *United States v. A.H. Fischer Lumber Co.*, 162 F.2d 872, 873 (4th Cir. 1947).  Hyatt was not misled and nor does it claim to have been.

Procedure.  Docket No. 72 at 7–8.  Hyatt states that the amended complaint is "riddled with generalizations" and contains no factual allegations specific to Hyatt, such as specific conduct, dates, times, or individuals.  *Id.*  A shotgun pleading is one in which "a party pleads several counts or causes of action, each of which incorporates by reference the entirety of its predecessors."  *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1242–43 (D. Colo. 2014); *see also Jacobs v. Credit Suisse First Boston*, No. 11-cv-00042-CMA-KLM, 2011 WL 4537007, at *6 (D. Colo. Sept. 30, 2011) (describing a shotgun pleading as one in which the pleader "recite[s] an extended narrative ... and proceed[s] to state numerous claims by simply reciting the formulaic elements of the claim and referring holistically to the preceding narrative as support").

Here, plaintiff's claims "largely appear to have the same factual underpinning" and this the case is not one where incorporating prior allegations makes it impossible to understand the claims.  *See Southwell v. Allstate Prop. & Cas. Co.*, No. 20-cv-01272-PAB-KMT, 2020 WL 4287194, at *3 (D. Colo. July 27, 2020).  The Court finds that plaintiff's allegations provide Hyatt, and the other defendants, fair notice of the claims and the grounds that plaintiff's claims against it rest on.  *See Warnick v. Cooley*, 895 F. 3d 746, 751 (10th Cir. 2018).  And because all of plaintiff's claims have essentially the same factual underpinning, the Court is not persuaded that this is a case where incorporating prior allegations into each claim makes the claims unintelligible.

41

### 3. Whether Plaintiff has Plausibly Alleged a TVPRA Claim

#### a. Direct Liability

##### 1. Whether Hyatt Knowingly Benefited

Hyatt argues that "[a] knowing benefit is more than a mere benefit" and that there must be a "'causal relationship' between a defendant's 'affirmative conduct . . . and receipt of a benefit.'" Docket No. 72 at 14 (quoting *Geiss*, 383 F. Supp. 3d at 169). Hyatt further insists that the allegations that Hyatt benefited by receiving payment for the rooms in which plaintiff was trafficked are insufficient to establish a "knowing benefit when all that is alleged is that [Hyatt] received money for the hotel room rental." *Id.* at 14–15. This argument fails for the reasons the Court has explained above. *See, e.g.*, Part IV.A.1.a; *see also M.A.*, 425 F. Supp. 3d at 965 ("[T]he rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the [§] 1595(a) standard."). The Court finds that plaintiff has plausibly pled that Hyatt knowingly benefited.

##### 2. Whether Hyatt Participated in a Joint Venture that it Knew or Should Have Known Engaged in Sex Trafficking

Hyatt argues that the facts alleged in the complaint are insufficient to state a claim for a TVPRA violation because the complaint does not show that Hyatt participated in a venture with plaintiff's trafficker. Docket No. 72 at 10. While Hyatt cites to § 1595 for the elements of a TVPRA claim, Hyatt's definition of "venture" calls on the Court to read into § 1595 an "overt act" requirement. *Id.* at 9–10. Hyatt believes this definition is "well-established" in federal law. *Id.* As explained above, this view is

42

mistaken.  *See, e.g.*, *E.S.*, 2021 WL 37457, at *4, *M.A.*, 425 F. Supp. 3d at 968–69.

Hyatt also insists that the complaint "never suggests that any Hyatt entity had any

association with the unnamed criminals responsible for the sex trafficking venture

alleged."  Docket No. 72 at 11.  Plaintiff does, however, make such allegations.  Plaintiff

alleges that Hyatt "actively participated in this illegal endeavor by knowingly or

negligently providing lodging to [plaintiff's] trafficker in which to harbor [plaintiff] while he

was trafficking her" and by "knowingly or negligently providing lodging to those who

purchased sex from [plaintiff] in which to harbor [plaintiff] while she was being

trafficked."  Docket No. 65 at 50–51, ¶¶ 134, 136.  Plaintiff also alleges that Hyatt

"profited from the sex trafficking of [plaintiff] and knowingly or negligently aided and

participated with [plaintiff's] trafficker in his criminal venture [by taking] no action as

[plaintiff] repeatedly visited the hotel, often with different guests, without any luggage,

avoiding all eye contact, and exhibiting signs of malnourishment, and often displaying

prominent bruising all over her person."  *Id.* at 50–51, ¶ 135.

Hyatt insists that plaintiff has failed to plausibly allege that it knew or should have

known "that the venture's purpose was sex trafficking."  Docket No. 72 at 12.  Hyatt

asks the Court to equate § 1595's "knew or should have known" language with "actual

knowledge or reckless disregard."  *Id.*  Hyatt then proceeds to argue that it was not

reckless.  *Id.* at 12–14.  Hyatt, however, is mistaken on the law.  The knowledge

requirement in § 1595 is not recklessness or actual knowledge, but rather negligence.

*M.A.*, 425 F. Supp. 3d at 966 (Plaintiff "does not need to prove reckless disregard under

[Section] 1595(a), only that the Defendants 'should have known' about the nature of the

venture under a negligence standard [and] [t]his does not require evidence of actual

knowledge or conspiracy between the Defendants and the trafficker.").

Plaintiff also highlights media coverage about sex trafficking at Hyatt hotels to show that Hyatt was on notice of sex trafficking generally.  Docket No. 65 at 33–34, ¶ 102.j.  But this is not sufficient to show that Hyatt, the parent company or franchisor, should have known about what happened to this plaintiff.  *S.J.*, 2020 WL 4059569, *5; *A.B.*, 2020 WL 5371459, at *9.  She also explains that, at the Hyatt Place where she was trafficked, she was forced to service "handfuls of buyers per day," each of whom entered and exited the hotel through the front doors, and that she and her trafficker would meet each guest in the hotel lobby and escort them to her room, resulting in "constant and voluminous" foot traffic.  Docket No. 65 at 48, ¶ 122.  Plaintiff also alleges that, on one occasion, plaintiff's trafficker "tried to forcefully inject her with heroin as his partners held her down."  *Id.* at 49, ¶ 124.  Because plaintiff had been "completely sober for months," she "screamed as loud as she could to stop them any way possible. The volume of her cry stopped her trafficker" and "made him change their hotel again." *Id.*

Again, these allegations, even when viewed in the light most favorable to plaintiff, fail to show how Hyatt, which plaintiff alleges is the Hyatt Place's parent company, were aware of plaintiff's trafficking.  *See A.B.*, 2020 WL 5371459, at *9. Plaintiff has provided no allegations showing how Hyatt received notice that plaintiff was trafficked at the Hyatt Place in the Tech Center.  Accordingly, plaintiff has failed to sufficiently state a claim for direct liability under the TVPRA against defendant Hyatt.

### b.  Indirect Liability

Hyatt argues that the complaint "does not . . . plausibly allege that Hyatt is . . . indirectly liable under Section 1595(a)."  Docket No. 72 at 4.  Plaintiff insists that Hyatt is indirectly liable "by virtue of its principal-agency relationship with the franchised properties."  Docket No. 74 at 13.  As explained, even if the Court accepts the facts that plaintiff has pled as true and resolves disputes in her favor, plaintiff at most establishes an actual agency relationship between Hyatt and the Hyatt Place hotel.  Her allegations, however, fail to state a claim under an agency theory because the complaint does not plausibly allege that Hyatt is liable under § 1595.  *See A.B.*, 2020 WL 5371459, at *11. Plaintiff has failed to show that Hyatt, the parent company, knew or should have known that plaintiff was trafficked at the Hyatt Place hotel in the Denver Tech Center in 2016. This is insufficient to establish indirect liability under the TVPRA.  Furthermore, the Court holds that plaintiff's apparent agency arguments made against Hyatt fail for the reasons discussed in Part IV.A.2.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Wyndham Hotels & Resorts, Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint [Docket No. 69] is **GRANTED**.  It is further

**ORDERED** that Defendant Marriott International, Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint [Docket No. 70] is **GRANTED**.  It is further

**ORDERED** that Defendant Best Western International, Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint [Docket No. 71] is **GRANTED**.  It is further

**ORDERED** that Select Hotels Group, LLC (Improperly Named as, "Hyatt Corporation")'s Motion to Dismiss [Docket No. 72] is **GRANTED**.  It is further

**ORDERED** that plaintiff's first, second, third, and fourth claims for relief are **DISMISSED** with prejudice.  It is further

**ORDERED** that judgment shall enter for defendants and against plaintiff on all claims.  It is further

**ORDERED** that this case is closed.

DATED February 24, 2021.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge